**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**MURRAY OHIO MANUFACTURING
COMPANY, Respondent.**

Nos. 15014, 15015.

United States Court of Appeals
Sixth Circuit.

Jan. 14. 1964.

Stephen B. Goldberg, Atty., N. L. R. B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

Frank A. Constangy, Atlanta, Ga. (Constangy & Prowell, Atlanta, Ga., William E. Boston, Lawrenceburg, Tenn., on the brief), for respondent.

Before WEICK and O'SULLIVAN, Circuit Judges, and BOYD, District Judge.

O'SULLIVAN, Circuit Judge.

The National Labor Relations Board here petitions for enforcement of two orders finding respondent, Murray Ohio Manufacturing Company, guilty of violations of Section 8(a) (1) and 8(a) (3) of the National Labor Relations Act, (§ 158(a) (1) and (3), Title 29 U.S.C. A.). The orders require respondent to cease and desist from conduct found to be unfair labor practice, and direct the reinstatement with pay of twenty-two employees in Case No. 15,014 and two employees in Case No. 15,015. The basis of the order in No. 15,014 was alleged discrimination in the use of an employee evaluation program which resulted in twenty-one of the involved employees not being recalled upon resumption of work following a seasonal shutdown, and discriminatory failure to rehire the other of the twenty-two involved. Like use of the employee evaluation program was the charge as to one of the employees in No. 15,015. The other employee in the latter case was found to have been discriminatorily discharged.

Respondent, Murray Ohio Manufacturing Company, referred to herein as the company, had, for a number of years, maintained its main plant at Cleveland, Ohio. There it manufactured toys, bicycles, window fans and other items of a related nature. In 1956, the company began operations in Lawrenceburg, Tennessee, and by September, 1957, all of its Cleveland operations had ceased. The labor union (UAW, AFL-CIO) which had represented the company's employees in Cleveland, had by this time begun an organizational campaign among the employees at Lawrenceburg. On May 22, 1957, the union petitioned for certification as the bargaining agent for these employees. An election was held on September 11, 1957, with the union losing by a vote of 624 to 558. This election was set aside by the Board on February 6, 1959, upon its finding that the company had, in resisting the union campaign, violated Section 8(a) (1) of the Act. Murray Ohio Mfg. Co., 122 N.L.R.B. 1306, enforced by this Court's order reported at 279 F.2d 686 (CA 6, 1959). Among the violations found were remarks by supervisory personnel threatening discharge of some employees if they voted for the union and predictions that the plant at Lawrenceburg would shut down if the union won the election. These events, however, are not involved here, having been already litigated and sanctions imposed for the violations found. But they are relied on by the Board here as relevant background to its finding of discriminatory use by the company of its evaluation program. All of these events occurred more than six months prior to the filing of the complaints involved here. They can be used as background only if there is evidence, independent of such background, of new violations occurring within the six months period of statutory limitations. Local 1424, I. A. M. v. N. L. R. B., 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed. 832.

1. CASE NO. 15,014

A. *The Company's Evaluation Program*

A. H. Willis was the company's vice-president in charge of production. Until September, 1957, he divided his time between Cleveland and Lawrenceburg, but began to give his full attention to the

latter plant in September, 1957, when the Cleveland operation was fully terminated. This was the same month in which the union election was held. Late in that month, Willis instituted an employee evaluation program to determine which of the company's employees would be recalled for the 1958 season. The work of the company is seasonal, with the beginning of the season occurring at the middle of January. Production then accelerates until it reaches its peak in July, at which time it begins curtailment and ends in complete shutdown in December. Willis testified that in September, 1957, he made a survey of the Lawrenceburg operation and concluded that labor costs were about five percent above normal. He concluded, also, that an excessive number of workers had been hired by the company during the plant's first year of operation. The Lawrenceburg operation proved to be bigger than originally contemplated. They had planned on an operation with about 500 employees, but after a year their employee complement had increased to around 1100. Willis testified that to solve the company's excessive labor costs, he decided to eliminate all employees whose performance was below average. With his supervisory staff, he decided to employ basically the same evaluation system that had been used in Cleveland to determine whether new employees were qualified to become permanent.

The evaluation system set up at Lawrenceburg consisted in part, in the use of rating sheets prepared by Willis which were distributed to department superintendents and foremen. The superintendents had the responsibility of making the ratings. The rating sheets used were described as the same as those frequently used "in all industries where they are starting plants where they have new employees being hired and especially at seasonal times." The sheets provided for ratings of above average, average, below average and unsatisfactory, in five categories: quality of work, quantity of work, dependability, knowledge and versatility, and attitude and cooperation. A sixth category, relations with others, provided for three ratings—unsatisfactory, below average, and satisfactory. Each rating was assigned a numerical value. For instance, a worker who produced an average quantity of work received a grade or score of 4 for that category. An average rating in each of these categories would result in a total score of 24. At the conclusion of the evaluations the completed rating sheets were turned in to the personnel department for summarizing. The summary disclosed that of a total of 1079 employees rated, 100 scored below 23. It was then decided that these 100 would not be recalled for work in the coming 1958 season. Of the 100 not recalled, 21 filed complaints with the Board charging that the evaluation system had been discriminatorily applied to them because of their previous activity during the union organization campaign.

After an extensive hearing, the Board's trial examiner found that respondent's evaluation system had not been conceived with a discriminatory purpose and was not discriminatory per se. He held that no violation of the Act was committed in the respondent's failure to recall 17 of the 21 complainants. He found, however, that as to the remaining four, viz.: Ronald Hartlein, James V. Sudduth, A. F. Jenkins, and Robert W. Brown, they were not recalled because of previous union activity and were victims of illegal discrimination. The trial examiner's Intermediate Report and Recommended Order was made on November 19, 1959. The National Labor Relations Board on November 15, 1961, with two members dissenting, reversed its trial examiner as to the 17 whose complaints were dismissed and held that all 21 of the complainants had been illegally discriminated against. The dissenters were of the opinion that the Board's general counsel had not met its burden of proving a § 8 (a) (3) discriminatory motive in the company's failure to recall the 21 alleged discriminatees, emphasizing that no evidence was offered to show that there was any disparity of treatment between the 21

who complained and the 70 odd others who were not recalled, but did not complain.

The Board majority's conclusion was arrived at by a sequence of inferences. It was of the opinion that because of the previously proven company misconduct in resisting the union's organization campaign and the closeness of the representation election, it was likely that the company feared that the election would be set aside. From this it was inferred that such fear motivated the company to conceive and use its employee evaluation program to rid itself of known union enthusiasts. There was evidence that the 21 complainants were such and, therefore, inferred the Board, their low ratings were the product of such illegal plan. We are of the opinion that such speculation cannot be accepted as justifiable inference.

The general counsel offered no evidence to show that the ratings given the alleged discriminatees were arrived at by any different method than that used in rating the balance of the 1079 employees who were rated. There was no attempt to show that the 21 complainers were the only, or the outstanding, union protagonists. There was evidence of their activities, but none to show whether any, or many, of the 558 who voted for the union were less or more active in the campaign than the complainers. The grades given to the 21 complainants on the rate sheets ranged from a low of 4 to a high of 16, all substantially below the passing grade fixed by Willis at 23. The reports detailed the conduct, attitudes, abilities, work habits and deportment of each employee. In keeping with an established company practice, supervisory personnel would, from time to time, make what were called incident reports describing specific occasions when an employee's misconduct came to the attention of foremen or other supervisors. Such reports were considered in the ratings given to some of the complainants, but the rating as a whole was based upon the general conduct and ability of the particular employee.

The burden was on the general counsel to prove its case against defendant by a preponderance of the evidence. N. L. R. B. v. Cleveland Trust Co., 214 F.2d 95, 99 (CA 6, 1954); Lawson Milk Co. v. N. L. R. B., 317 F.2d 756, 760 (CA 6, 1963). This burden, of course, may be met by drawing legitimate inferences from established facts and it is the Board's exclusive province to make such legitimate inferences. N. L. R. B. v. Wiltse, 188 F.2d 917, 925 (CA 6, 1951); N. L. R. B. v. Ford, 170 F.2d 735, 739 (CA 6, 1948); N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 596–597, 61 S.Ct. 358, 85 L.Ed. 368, 378; N. L. R. B. v. Nevada Consolidated Copper Corp., 316 U.S. 105, 107, 62 S.Ct. 960, 86 L.Ed. 1305, 1307. But the Board's power to draw inferences is not beyond all judicial control, and upon the courts is cast the responsibility of determining whether a Board finding of fact, based on inference or otherwise, is supported by substantial evidence, when viewed on the record as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The Board's majority, contrary to its trial examiner and two of its members, concluded that respondent's evaluation system was illicitly conceived and applied. "Contrary to the Trial Examiner, we believe that Respondent's employee evaluation program was adopted as a device to eliminate union adherents, and was therefore *unlawful in its inception*. We are satisfied, moreover, that the program was *discriminatorily employed* against all the complainants."

The material from which the Board made its inferences consisted of the following: The pre-election antiunion conduct of respondent, its knowledge that the alleged discriminatees had been active supporters of the union, the closeness of the election which had shortly preceded the institution of the evaluation program and the Board's inference that "Respondent, in view of all its unlawful conduct, must have at least suspected that a new election would be directed, that a change of only 34 votes could result in the certification of the union, and that it would

have the opportunity following its seasonal shutdown which was in the offing to pick and choose its employee complement." It also relied on evidence that several employees who had been guilty of conduct which in the Board's view should have caused them to receive less than a passing grade, were given passing grades and reemployed.

It further expressed its own dislike of the methods and standards used by the Respondent. Referring to one category of the rating sheet, it said:

"Indeed, this single objectively determinable rating element appears to have been misunderstood or misapplied to a degree which made the ratings under it less objective than ratings accorded to employees under the inevitably subjective factors on the rating sheet."

With like appraisal of the respondent's use of incident reports, it said:

" * * * they are broad, subjective characterizations of the subject employees' general attitude or performance over extended time periods and were, therefore, impossible to refute and difficult to impugn through cross-examination. In the few instances in which the conduct complained of took on the character of an 'incident' sufficiently to permit cross-examinational exploration of the matters reported, the subjects of complaint were unusually trivial, such as mistakes in counting, returning late from lunch, speeding up machine, profanity, damaging a bike carton and incorrect thinking."

■■ We first observe that it is impermissible for the Board to find an unfair labor practice simply because it believes that an employer's method of rating is less than sound. However faulty the employer's methods (and we do not here intimate that they were faulty) they will not convict it of violation of the Act unless such methods were purposely used to discriminate and to discourage union membership. N. L. R. B. v. McGahey, 233 F.2d 406, 412, 413

(CA 5, 1956); Interlake Iron Corp. v. N. L. R. B., 131 F.2d 129, 133, 134 (CA 7, 1942); Cf. N. L. R. B. v. Adkins Transfer Co., 226 F.2d 324, 328 (CA 6, 1955); N. L. R. B. v. Lassing, 284 F.2d 781, 782 (CA 6, 1960); N. L. R. B. v. Newton Co., 236 F.2d 438, 446 (CA 5, 1956); N. L. R. B. v. Mylan-Sparta Co., 166 F.2d 485, 491 (CA 6, 1948). The Board's burden was likewise not discharged by showing that the respondent's evaluation system might be capable of being used discriminatorily.

"It must go further and show it was used discriminatorily and that the discrimination was because the employee upon whom the system was thus used was a union man and the discrimination was because of his union activities. This burden is not met by showing that the company was hostile to the union." Peoples Motor Express v. N. L. R. B., 165 F.2d 903, 907 (CA 4, 1948).

The weakness which we find in the Board's case is the obvious disinclination of its General Counsel to enter into the one field of evidence which would contain proof, if any there was, of the claim of discrimination. Some 1079 of respondent's employees were rated under one system. This number was closely divided between those who had voted for and those who had voted against the union. Out of the total rated, only 100 failed to get a passing grade and of these only 21 complained of discriminatory treatment. Without any attempt at a comparative study of the 79 failures who did not complain with the 21 who did, and without any study of the ratings or the methods by which they were made, of the nearly one thousand whose ratings qualified them for reemployment, the Board decided that all of the failures who complained were the victims of discrimination prompted by anti-union animus of their employer. In the election which preceded inauguration of the evaluation system, 558 employees voted for the union, but the great majority of them were so rated as to be eligible for recall. The General Counsel's case made no disclo-

sure·as to whether among the union adherents who passed there were many, or none, who had been union leaders in the pre-election campaign and whose union activities were known to respondent. Neither was there any inquiry as to whether the 79 non-complainant failures were union adherents or opponents. The Board disposes of the General Counsel's avoidance of entering this field of evi·dence by its footnote observation:

> "If additional evidence concerning the other employees could have changed this picture somehow, the respondent was free to present such evidence. But it chose not to do so, and the resultant absence of this evidence relating to employees not named in the complaint cannot be deemed prejudicial to the General Counsel's case."

■ We do not think that the General Counsel may isolate the facts on which he draws his inferences from the abundant evidence which should be examined in its totality, if the truth is to be found, and yet claim he had met his burden of proof. We believe the dissenting members of the Board appropriately observed:

> "Discrimination in our view, presupposes or implies disparate treatment. Without an adequate background, against which the treatment accorded the complainants may be compared and contrasted, disparate treatment cannot be shown to exist."

■ We do not think that the Board made such a prima facie case as shifted the burden of proof to respondent or required it to undertake entry into the field which contained the only evidence which would provide the truth. The Board's case in no wise established that the low ratings acquired by complainants, 4 to 16, were out of line with or arrived at by any different means than the ratings which were given to the remaining 79 who were below grade 23 and the near 1000 who had a grade of 23 or better. The union activities of the complainants, known to the company, did not insulate them from the consequences of such ratings. Lawson Milk Co. v. N. L. R. B., 317 F.2d 756, 760 (CA 6, 1963); N. L. R. B. v. West Ohio Gas Co., 172 F.2d 685, 688 (CA 6, 1949); N. L. R. B. v. Mylan-Sparta Co., supra, 166 F.2d p. 491. Neither do we think that the previous conviction of violations of the Act in the pre-election campaign so attainted respondent as to allow suspicion to suffice for proof when it was again charged with wrong doing. Nowhere was there any proof that the use of the evaluation system was otherwise than a wise, sound and needed managerial scheme to promote its own economic health.

The trial examiner, although finding no discriminatory motivation in respondent's adoption of the employee evaluation plan, was of the opinion that it was discriminatorily applied in the case of four employees, Hartlein, Sudduth, Jenkins and Brown. The basis of his conclusion as to these four was his view that the supervisors who rated them had inadequate personal knowledge of the material from which their respective ratings were compiled. Further, he found credible the contention of one or more of such employees that their work performance was not inadequate and did not justify their low ratings. We feel, however, that the General Counsel failed, as he did with the other 17, to make out a prima facie case requiring the respondent to undertake disproving the charge of discrimination made by these four.

■ In appeal No. 15,014, there remains the case of Edith McMullins, who complained that failure to recall her to work after the 1957 seasonal shutdown was because of the union activities of herself and her husband. This lady had received an evaluation rating of 23, which qualified her for reemployment. However, when the 1958 season opened, the number of female employees in department 74, wherein Mrs. McMullin had been employed, was reduced to four. Four women with greater seniority than Mrs. McMullin were given these jobs. Later on, there was an opening for a

female employee in another department and out of a number of women then in a layoff status, a supervisor selected an employee, Comerad, who had three days less seniority than Mrs. McMullin. Three other women who had greater seniority than Mrs. Comerad and Mrs. McMullin were also passed over in filling this one position. There was testimony that Mrs. Comerad had more experience in the work of the job to be filled and was, accordingly, chosen. There was no direct evidence that Mrs. McMullin's union activities were known to respondent, although the trial examiner stated, "Respondent probably knew or suspected that she was a supporter of the union by reason of the activities of her husband * * * but there is no evidence that any supervisor of the respondent ever mentioned the subject to her." The Trial Examiner concluded that the failure to recall Mrs. McMullin and other female employees, "was due entirely to economic reasons, rather than a desire to discriminate against them to discourage membership in a labor organization." We are persuaded that such finding, concurred in by two members of the Board, was correct and that the Board's majority finding to the contrary is not supported by substantial evidence when reviewed on the whole record. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456.

Enforcement of the Board's order involving the 22 employees in appeal No. 15,014 is denied.

(2) CASE NO. 15,015

A. *Failure to Recall William H. Miller.*

 William H. Miller was a temporary employee of respondent during the 1958 season. At the end of 1958 he was given a rating of 23 under respondent's evaluation system. Although this was a borderline rating, it did qualify him for reemployment and he was so reemployed in 1959. The evidence discloses that the union's efforts to gain bargaining rights in the respondent's plant were continuing in the 1959 season. In the summer of 1959, Miller became an active and conspicuous union adherent. He was a member of its organizing committee, its only member on the shift in which he was employed. He wore a union button at work. This obviously irked his immediate foreman and supervisor, who sought to dissuade him from his union loyalty. There was evidence that such attempts at persuasion included the equivalent of threats and predictions of disadvantages that could accrue to Miller and his "kin people" if he persisted in his espousal of the union cause. This improper anti-union conduct was actively pursued and was not limited to isolated incidents, nor was it denied by the supervisors who were guilty of it. At the end of 1959 season, the same supervisors who had indulged in the above conduct provided the material which caused Miller to receive a failure grade of 14, as against his previous passing grade of 23. A complaint of violation of § 8(a) (1) and (3) was sustained upon the Trial Examiner and the Board concluding that Miller was down graded because of his union activity.[1] While the respondent company offered evidence that Miller's work in 1959 had deteriorated and provided incident reports of his poor work habits, the Board supported its Trial Examiner's conclusion of discriminatory conduct. We are of the opinion that substantial evidence supported such finding and we accept it. N. L. R. B. v. Southern Electronics Co., 302 F.2d 145 (CA 6, 1962); N. L. R. B. v. Bendix Corp., 299 F.2d 308, 310 (CA 6, 1962).

B. *Discharge of Clyde B. Richardson*

During the season of 1960, Richardson was a known union protagonist, a member of its organizing committee. He was

---

1. In 1959, respondent rated only its temporary employees, i. e., those who came in as new employees in the current season. Of 500 so evaluated, some 51 were graded below 23 and thereby disqualified for reemployment. Four of these, including Miller, filed unfair labor charges. The complaint of three of these four was dismissed upon a finding of no improper discrimination.

the only member of his crew who wore a union button while at work. He wore a union tee shirt, passed out union matches, pencils and circulars. Evidently, some of this was on company time and property. On March 1, 1960, a foreman asked Richardson about attending a union meeting on the previous Saturday night. This was followed by antiunion observations by the foreman and a warning that campaigning for the union on company hours would result in a layoff and ultimate discharge, if persisted in. The foreman stated that "jobs are scarce around this part of the country." The day following, Richardson did not report for work because an ice storm prevented his getting to the plant. When he reported the next day, he was told that the position with his regular work crew had been filled when he was absent the day before. He was then directed to do some outside work. He protested that he was not adequately dressed for such work. His foreman's only reply was, "That is what they said to tell you." Richardson did not report to his new assignment because, as he claimed, he was not dressed for outside work. He checked out and went home without permission. Illness prevented Richardson from working the next day, a Friday, and he could not call in because his telephone line was down. On Monday, he reported for work and learned that he was off the company payroll.

Respondent offered evidence detracting from Richardson's account of these events, but the Trial Examiner and the Board believed Richardson. The Trial Examiner concluded "that Respondent seized upon Richardson's leaving of the job on March 3 as a pretext to effect his termination, the real reason for which was his union membership and activities." Credibility is for the Trial Examiner and the Board. United Fireworks Mfg. Co. v. N. L. R. B., 252 F.2d 428, 430 (CA 6, 1958). Likewise, making the inference that respondent seized upon Richardson's unexcused leaving of

his job as an opportunity to rid itself of a union man was, on the record before us, within the prerogative of the Board. N. L. R. B. v. Wiltse, 188 F.2d 917, 925 (CA 6, 1951); N. L. R. B. v. Ford, 170 F.2d 735, 739 (CA 6, 1948); N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 596–597, 61 S.Ct. 358, 85 L.Ed. 368, 378. Even though unexcused absence from work or refusal to accept a particular assignment would be good cause for discharge, if the exercise of this right is tainted with a discriminatory motive under § 8 (a) (3) of the Act, a violation may be found. N. L. R. B. v. Coats and Clark, Inc., 231 F.2d 567 (CA 5, 1956). We are satisfied that the Board's findings as to the Richardson case is supported by substantial evidence.[2] The Board's order in appeal No. 15,015 is enforced.

---

2. The complaints of three other employees that they were discharged in violation of § 8(a) (3) were heard at the same time as the Richardson affair. The dismissal of their complaints by the Trial Examiner was affirmed by the Board.