**CHAMPION PAPERS, INC. (OHIO DIVISION), Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 17290.

United States Court of Appeals Sixth Circuit.

April 19, 1968.

the latter "took a greater responsibility in the trial of the case, and was here for a longer time in court."

Norman Diamond, Washington, D. C., for petitioner, David R. Kentoff, Washington, D. C., Barry J. Levey, Middletown, Ohio, on the brief, Arnold & Porter, Washington, D. C., Levey & Levey, Middletown, Ohio, of counsel.

Allen J. Berk, National Labor Relations Board, Washington, D. C., for respondent, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Herman M. Levy, Theodore Martineau, Attys., National Labor Relations Board, Washington, D. C., on the brief.

Before O'SULLIVAN, CELEBREZZE and McCREE, Circuit Judges.

O'SULLIVAN, Circuit Judge.

We consider the petition of Champion Papers, Inc. (Ohio Division) to review and set aside an order of the National Labor Relations Board, which found Champion guilty of violating Section 8 (a) (1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (3).[1] The Board's determination that Champion had violated the Act rested upon a finding that in May, 1965, during a rehiring program, Champion denied reemployment to seven female former employees because of their union [2] sympathies and activities or because of like sympathies and activities on the part of a husband or relative of one or more of them. Champion denied that any of the seven had been a victim of anti-union motivation. In general, its explanation for refusal to rehire the alleged discriminatees was that they, or a husband or relative of one or more of them, entertained a wrong "attitude" toward, or "dissatisfaction" with, the company.

Upon review of the whole record, we hold that the Board's factual findings are supported by substantial evidence, and that it committed no errors of law. We, therefore, deny Champion's petition for review and grant the Board's request for enforcement of its order. 29 U.S.C. § 160(e).

1. Background and History of Company-Union Contest.

Between 1961 and the 1965 events here involved, Champion resisted the continuing efforts of the union to obtain bargaining rights for its hourly workers. In February, 1962, the union lost a Board-conducted election; in 1964 it lost another such election, 1001 to 875. The Regional Director set aside this 1964 election because of Champion's alleged misconduct; at the ordered rerun election held on January 6, 1965, the union again lost 962 to 801. The union's campaign

1. "Sec. 8(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

   *     *     *     *     *

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *."

2. The involved union is the United Papermakers and Paperworkers Union, AFL-CIO, and the Board's Decision and Order (with its examiner's initial decision, which was affirmed in toto by the Board) is reported at Champion Papers, Inc. (Ohio Division), 158 NLRB 978 (1966).

continued, and it is a fair assumption that the company's attitude of resistance also continued.

During this time, 1961 to 1965, Champion's work force at its Hamilton, Ohio, plant had, for economic reasons, decreased from 3700 to 2300. The seven complainants in this cause were among some 250 women, engaged in sorting operations, who were terminated as regular employees as part of the general reduction of the work force. Thereafter, however, Champion had occasion, from time to time, to recall for part time work employees who had been terminated as regular employees during such reduction. The seven alleged discriminatees upon whose charges the involved complaint was bottomed were among those so recalled. They are Pauline Reece, Fairy Mae Jones, Ineda Turner, Jeanette Allen, Delois Halcomb, Esther Jean Turner and Ava June Hopkins.

Prior to their termination during the company's work force reduction, all of the above seven had had relatively long tenure as full time employees of Champion; five had been initially employed in the early 1950's and the other two in 1954 and 1956. All had received substantial severance benefits when terminated and all but one had been recalled numerous times for part time sorting work, most of them 10 or 11 times.

In May of 1965 Champion decided to call back 30 women for full time employment in its sorting operation. Some 60 women were interviewed and 30 were selected for reemployment. The seven complainants were not selected.

### 2. Champion's Past Policy of Seniority Hiring.

The Board's General Counsel gave evidence to establish that—until the May, 1965, call backs—rehiring at Champion for full or part time employment had been on the basis of seniority. He convinced the trial examiner that the company had deviated from such traditional practice in the May, 1965, hiring so that it could reject former employees with union sympathies or connections. The examiner found that the ladies in question were the victims of such plan. Champion admitted that the May, 1965, hirings were not based on seniority, and contended that its selections were the result of the examination of a variety of other legitimate objective and subjective factors. It also disputed that its past rehirings had been on a seniority basis. We believe there was substantial evidence supporting the Board's finding that Champion's disregard of seniority in the 1965 rehirings was a departure from its past practices.

However, this factor is of small importance to the ultimate issue of anti-union discrimination, for had strict seniority been observed, three of the seven discriminatees would not have been rehired, although others had seniority substantially equal to or better than all but one of the thirty who were hired. We therefore move on to an examination of the other record evidence to determine whether there was substantial support for the examiner's finding that:

"[T]he Respondent's discrimination against the complainants is established independently of the critical seniority factor * * *." 158 NLRB, at 981 n. 8.

### 3. Other Evidence Bearing on Issue of Discriminatory Refusal to Rehire.

When Champion's intention to rehire 30 women was announced, or became known, each of the seven alleged discriminatees applied for one of the jobs. Some were asked to apply and others did so on their own. While Champion's principal witness and Supervisor of Personnel Services, Stephen C. Charles, gave some evidence that these women did not measure up to one or more of the standards which he had set for evaluating the job applicants, the trial examiner was of the opinion that these claimed shortcomings were not of controlling importance in Champion's decision. We agree. The witness Charles indicated that previous production records of one or more of the discriminatees were less than satisfactory. We will not attempt analysis of this

evidence, other than to say that the examiner found, from figures supplied by the company, that of those selected for employment, 16 had lower production averages than discriminatee Allen, 15 lower than Reece, 13 lower than Jones, 10 lower than Halcomb and Hopkins, 9 lower than Esther Turner and 8 lower than Ineda Turner.

It is a fair inference that the controlling reason for denial of reemployment was either the "attitude" toward or "dissatisfaction" with the company by the several discriminatees or their respective husbands or relatives. There was evidence that these were the common reasons assigned by the witness Charles when asked by these women why they were rejected. Champion has refrained, even in its address to this Court, to adequately disclose in what manner the respective discriminatees or their relatives had exhibited a wrong "attitude" toward or "dissatisfaction" with Champion. It happens, however, that each of the complainants or the relatives whose wrong attitude or dissatisfaction was visited upon several of them, had been active and quite visible union protagonists.[3]

The following recitations in the Board's brief to this Court will be illustrative:

a) *Pauline Reece.*

"Mrs. Reece was first employed by petitioner in October 1950. She worked full time until she was laid off during the reduction period in September 1963. She was recalled by petitioner for part-time work approximately 11 times through November 1964. Upon hearing that petitioner was rehiring sorters, Mrs. Reece called petitioner on May 7 to apply for a job. When she asked Director of Personnel Services Stephen Charles whether he had tried to reach her, Charles replied: 'No, Pauline, I am not going to lie to you. We haven't even considered you.' He further told her that 'we just *felt that you were dissatisfied*' and thought that she would not want to return. * * * (Emphasis supplied.)

"Though Mrs. Reece pressed Charles to explain why he felt she was dissatisfied he refused to elaborate. * * *

"Of the 30 sorters finally rehired, Mrs. Reece had more seniority than all but one. Mrs. Reece had been extremely active in the Union campaign. She not only distributed literature and acted as an election observer for the Union, but also made recorded radio and telephone messages. Charles had full knowledge of her union activities; in fact he testified that 'everybody in Hamilton' knew of her efforts."

b) *Fairy Mae Jones.*

"Mrs. Jones worked full time from February 1951 to September 1963. She was thereafter recalled for part-time work approximately a dozen times through November 1964. On May 7 * * * she called Charles * * *. The next morning she was interviewed by Charles and his assistant, Ronald Wilson. * * * Mrs. Jones was asked whether she had any relatives working for petitioner. When she replied that her husband, Perry Jones, was an employee, Wilson spoke up and stated that he knew her husband. Charles informed Mrs. Jones that he would call her within the next few days * * *. Charles never called, so she called him and asked why she had not been contacted. Charles stated: 'Well, Mae * * * you have a perfect work record, good attendance * * * but there is one exception was refusing to rehire her because of her or her husband's union activity, that neither she nor her husband "were union," Stephenson replied: "Well, that is not the way I hear it. If you people don't like the way things are run at Champion you should go someplace else and work."

3. In the case of Ava June Hopkins, neither she nor her husband were shown to have been union activists. However, her husban was a member of the UAW at the Fisher Body Plant, a union which had actively assisted the union drive at Champion. When she protested to Division Manager Stephenson that if the company

* * * [are] *you satisfied with Champion?'* When she assured Charles that she was, Charles asked her: 'Well how about your husband?' * * * Mrs. Jones stated that she thought her husband was satisfied working for the company; nevertheless, Charles replied: 'I am awfully sorry, *but your husband's poor attitude is keeping you out.'* * * * (Emphasis supplied.)

"Mrs. Jones' husband * * * has been employed by the petitioner for more than 20 years. He was very active in the 1964–65 Union campaign as a member of the organizing committee and as a distributor of Union literature. Of the 30 sorters hired, Mrs. Jones, like Mrs. Reece, had more seniority than all but one."

c) *Ineda Turner.*

"Mrs. Turner was employed full time * * * from April 1952 to November 1962. Subsequently, she was called back to work on a part-time basis on numerous occasions. * * * She informed Charles that her husband worked at the local General Electric plant where he was a member of the United Automobile Workers Union. She also told Charles that her husband's cousin, Adrian Turner, was employed by petitioner.

"When Turner subsequently called Charles concerning reemployment, Charles stated, 'We have two things down here on your records * * *. One, the last time you were in to work your average dropped a little, but it is nothing to be considered * * *. You've got one other thing down here * * *. *You've been dissatisfied with Champion.'* Mrs. Turner asked Charles the basis for his information, but he did not reply. * * * (Emphasis supplied.)

"Less than two weeks before Charles' refusal to rehire her, Mrs. Turner had obtained from Charles a personally signed letter of recommendation, which stated, *inter alia:* 'Ineda was rated by her supervisor on Performance Evaluation as good on quantity of work, quality of work, *attitude* and attendance. If age limit permitted, she would be reemployed. I feel that with these qualities, Ineda would be qualified for consideration for employment.' Of the 30 sorters hired by petitioner, 20 had the same or less seniority than Mrs. Turner."

d) *Jeanette Allen.*

"Mrs. Allen began work as a sorter in 1952. * * * In May [1965] Mrs. Allen applied for reemployment and was interviewed by Charles. During the interview, Charles asked Mrs. Allen whether Robert Schaney and Odna Hicks were her cousins. When she answered that they were, Charles further remarked, 'Oh, Charles Allen is your husband.' Mrs. Allen answered that he was and Charles stated that he knew him personally.

"A week later, she called Charles to learn her status. Charles told her: 'Well, Jeannette, your work record is fair * * * but I am sorry we can't use you at this time, *because your husband is very dissatisfied with the company.'* At the time of Charles' statement, Mrs. Allen's husband, Charles, had worked for petitioner for 15 years. He was very active in the most recent Union campaign. He served on the organizing committee, distributed literature and acted as the Union observer in the August 1964 elections. In addition, he appeared on behalf of the Union at a Board hearing in Cincinnati. Mrs. Allen also participated in Union activities by holding several Union meetings at her home." (Emphasis supplied.)

e) *Delois Halcomb.*

"Mrs. Halcomb worked full time as a sorter from June 1953 to March 1961. She was thereafter recalled to part-time work approximately 25 times through November 1964. On May 7, 1965, the personnel office called Mrs. Halcomb and asked her if she was interested in being rehired on a permanent basis. She replied that she was

and an interview was set up for the same day with Ronald Wilson, Stephen Charles' assistant. Wilson * * * asked her if Lawrence Halcomb was her husband; * * *.

"About a week later, Mrs. Halcomb called Charles and inquired why she had not heard from petitioner. Charles responded: 'You've got a wonderful work record, good attendance and good attitude * * * but *your husband is dissatisfied at Champion.*' * * * Mrs. Halcomb then asked why she had been called in the first place; Charles replied: 'Well, we didn't realize that Larry was your husband.' Lawrence Halcomb, a 20-year employee, was active in the unionization drive. He was a member of the plant organizing committee, hosted Union meetings, and passed out Union leaflets." (Emphasis supplied.)

### f) *Esther Jean Turner.*

"On May 7, 1965, she [Esther Turner] was contacted by the personnel office and asked to come in that day for an interview. * * * At the end of the interview, as Mrs. Turner got up to leave, Charles repeated her last name aloud and then said: 'I used to work with a guy in No. 2 Shipping by the name of Turner * * *. You wouldn't by any chance be Adrian Turner's wife, would you? She replied that she was.

"After waiting a week to hear from Charles, Mrs. Turner called him. Charles told her she was not going to be rehired because her attendance had been poor. She disputed Charles' assertion and asked him to check her personnel folder. Charles left the phone for a few minutes and when he returned he admitted her attendance had been good. Mrs. Turner then asked Charles to be 'honest' and to give her the 'real reason.' Charles replied: 'Esther, after going through and checking we have found something that would make it impossible for you to be back at Champion, * * * *your husband's attitude.*' * * * She then asked: 'Is is because of my husband's Union activity?' Charles only answered: 'Well, now I didn't say that * * * I didn't mention Union, Esther * * * you did.' * * * 'Esther at the time that you were interviewed * * * I had no idea that you were A. G. Turner's wife.' * * * 'Esther, if you were seeking employment elsewhere * * * your recommendation would be A-1.' * * Adrian Turner, Mrs. Turner's husband, was an active member of the organizing committee, a distributor of Union literature, and had acted as an election observer for the Union. His activities were known to Charles." (Emphasis supplied.)

### g) *Ava June Hopkins.*

"* * * Wilson called Mrs. Hopkins and told her she would not be rehired *because of her 'attitude'* toward petitioner and because she had been *'very dissatisfied'* the previous year. Later the same day, Mrs. Hopkins saw Charles, who only repeated Wilson's position * * *. Finally, she called Division Manager R. O. Stephenson and asked him if there was a chance she could be hired * * *. When he answered that there was not, Mrs. Hopkins stated: 'If this is because of the Union, I am not Union * * * my husband is not Union either' * * *. Stephenson replied: 'Well, that is not the way I hear it. If you people don't like the way things are run at Champion you should go someplace else and work.' * * * As an employee at the Fisher Body plant, Mrs. Hopkins' husband belonged to the United Automobile Workers Union, which actively assisted in the unionization effort at Champion * * *."[4]

We recognize at once that the foregoing is a version of the evidence favoring the Board's and its examiner's

---

4. Division Manager Stephenson did not take the stand to deny this very damning evidence.

factual conclusions. In some respects, Champion's evidence and its shading were to the contrary, but in the main there was little evidence directly colliding with the foregoing. The critical collision arises from the inferences drawn by the Board which were contrary to Champion's insistence on innocent motivation in the treatment of the discriminatees. Champion makes much of the trial examiner's observation that its principal witness, Personnel Manager Charles, "was a very articulate witness and an essentially truthful one" but nevertheless comes to factual conclusions contrary to some of his testimony. Notwithstanding that he found him "essentially" truthful, the trial examiner did find that Charles was untruthful in his insistence that union activities had nothing to do with the "dissatisfaction" which barred the complainants from being rehired, and in his inability or unwillingness to satisfactorily explain from what material the conclusional phrase "dissatisfaction" was fashioned. A factfinder—jury, judge or administrative agency—is not barred from finding elements both of truth and untruth in a witness' testimony. NLRB v. Universal Camera Corp., 179 F.2d 749, 754 (2nd Cir. 1950), remanded on other grounds, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; NLRB v. United Brotherhood of Carpenters and Joiners of America, Local No. 517, AFL, 230 F.2d 256, 259 (1st Cir. 1956).

We have set out the facts found by the Board and its examiner at the above length because we are persuaded that from these facts, support for the Board's final inference of anti-union motivation easily appears.

The critical facts, direct or circumstantial, which form the basis for the Board's decision are the company's resistance to the union's continuing campaign for bargaining, Champion's opportunity to deny reemployment to union protagonists in the 1965 hirings, knowledge by the company that the discrim-

inatees or their husbands or relatives were union activists, and the cryptic reliance by Champion's management on "attitude" or "dissatisfaction" as a reason for its denial of employment of the discriminatees. There is no dispute as to the first two factual elements; there is direct proof that all of the discriminatees or a husband or relative of one or more of them were strong and quite visible union adherents,[5] and even though Charles denied knowing about such activities as to some of these people, we will not fault the Board's trial examiner's refusal to accept as credible such protestation. NLRB v. Link-Belt Co., 311 U.S. 584, 602, 61 S.Ct. 358, 85 L.Ed. 368 (1941); Wonder State Mfg. Co. v. NLRB, 331 F.2d 737, 738 (6th Cir. 1964); NLRB v. Putnam Tool Co., 290 F.2d 663, 665 (6th Cir. 1961); Hartsell Mills Co. v. NLRB, 111 F.2d 291, 292–293 (4th Cir. 1940).

▆ As to the fourth basis, while in one or more instances Charles attempted to substantiate the claimed wrong "attitude" or "dissatisfaction," in the main he made little attempt at definition and the Board was at liberty to accept the accounts given by the General Counsel's witnesses as to what Charles had said. Aside from the rule that assessment of credibility and the drawing of legitimate inferences are within the special province of the Board (NLRB v. Murray Ohio Mfg. Co., 326 F.2d 509, 513 (6th Cir. 1964); NLRB v. Hamilton Plastic Molding Co., 312 F.2d 723, 727 (6th Cir. 1963); NLRB v. Bendix Corp., 299 F.2d 308, 310 (6th Cir. 1962), cert. denied, 371 U.S. 827, 83 S.Ct. 47, 9 L.Ed.2d 65), on our own analysis, we feel that the NLRB's case was fairly proved.

### 4. Conclusion.

▆ We are aware that an employer is not required to explain his refusal to reemploy a former employee, and can hire or fire at will, absent a motive condemned by the NLRA. NLRB v. West Side Carpet Cleaning Co., 329 F.2d 758,

5. Subject to the qualifications noted supra, n. 3, as to Ava June Hopkins.

761 (6th Cir. 1964); NLRB v. Link-Belt Co., 311 U.S. 584, 602–603, 61 S.Ct. 358, 85 L.Ed. 368 (1941); NLRB v. Wiltse, 188 F.2d 917, 925 (6th Cir. 1951); NLRB v. Ford, 170 F.2d 735, 739 (6th Cir. 1948); NLRB v. Murray Ohio Mfg. Co., supra, 326 F.2d at 514–515. But in this case, the explanation which Champion's chief witness himself gave for refusing reemployment to these discriminatees warranted a conclusion of an 8(a)(3) violation. It has been held that failure to explain the reasons for a layoff may in some circumstances support an inference of discrimination. NLRB v. Bird Machine Co., 161 F.2d 589, 592 (1st Cir. 1947); North Carolina Finishing Co. v. NLRB, 133 F.2d 714, 718 (4th Cir. 1943), cert. denied, 320 U.S. 738, 64 S.Ct. 39, 88 L.Ed. 437. It is not necessary that we here go that far. We are satisfied that there is substantial evidentiary support for the determination by the Board and its examiner that the wrong "attitude" and the "dissatisfaction" the company found in the discriminatees was the product of their union sympathies and their visible exhibition thereof.

Champion insists that our decision in NLRB v. Murray Ohio Mfg. Co., 326 F.2d 509 (6th Cir. 1964), is relevant to and controlling of this case.[6] We disagree. There 23 employees out of some 100 who had failed to receive a passing grade in an evaluation program charged that it was not their low grades that hurt them, but their union activities. The employer's operation was seasonal. Management decided that its labor costs were excessive and prior to the commencement of the involved season, conducted an evaluation of all of its 1079 employees with the intention of eliminating those whose performance was below average. The 23 alleged discriminatees were shown to have been union activists, but there was nothing else to support a charge of discrimination. Their failure to receive a passing grade was not substantially questioned. We held that the

General Counsel had failed to show any disparity of treatment of the alleged discriminatees, and that the employer had presented valid reasons for his refusal to rehire. We said that if the General Counsel intended to rely on some disparity, it was his duty to enter the evidentiary area which would disclose it.

Here the General Counsel did show that the discriminatees had better ratings on their previous performance than many of the women who were accepted for employment—that Champion discontinued its previous practice of following seniority in the selection for reemployment, and that it could give no reason for failure to employ the discriminatees other than the undefined charge of dissatisfaction. Notwithstanding the employer's protestation that union activity did not affect its rehiring decisions, the witness Charles, when asked by one woman who was refused reemployment because of her husband's attitude, "Is it because of my husband's union activity?" contented himself with the reply, "Well, now I didn't say that * * * I didn't mention union, Esther, you did." On another occasion when a discriminatee whose husband worked at another plant and was a member of the UAW, which assisted in the union activities at Champion, asked "If this is because of the union, I am not union * * * and my husband is not union either," a Division Manager of Champion replied, "Well, that is not the way I hear it. If you people don't like the way things are run at Champion you should go someplace else and work." Such conduct would do more than cause suspicion.

From the foregoing and the other evidence set out herein, it is clear that it would take little sophistication to justify a clear and fair inference that past "union activity" was the basic reason for denial of reemployment to the discriminatees.

The Board's order is enforced.

6. While not of critical importance, we mention that in that case the Board's decision reversed its examiner's factual findings. Two Board members dissented.