NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

RICH'S OF PLYMOUTH, INC.,
Respondent.

No. 77–1497.

United States Court of Appeals,
First Circuit.

Argued April 4, 1978.

Decided June 6, 1978.

882

Lee Ann Huntington, Atty., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Elliott Moore, Deputy Associate General Counsel, and William R. Stewart, Atty., Washington, D. C., were on brief, for petitioner.

Duane R. Batista, Boston, Mass., with whom David E. Watson and Nutter, McClennen & Fish, Boston, Mass., were on brief, for respondent.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

The National Labor Relations Board (the Board) seeks enforcement of a cease and desist order issued after its finding that respondent violated section 8(a)(1) of the National Labor Relations Act (the Act) (1) by soliciting employee grievances and promising and granting benefits with intent to discourage support for a union campaign and (2) by creating an impression of surveillance among the employees. Also at issue is whether respondent shall be required to reinstate with back pay a union supporter who walked off her job in a fit of pique on a busy night. We first address those portions of the Board's order which we enforce.

*Promise and Grant of Benefits*

Respondent is a chain of nine retail stores. In April, 1976, Local 222 of the Retail Clerks International Association, AFL–CIO embarked on a campaign to organize the employees of respondent's Plymouth, Massachusetts store. A flyer distributed among the employees announced that an initial organizational meeting would be held on April 26.

The same day of the union's first meeting, Gerald Costello, personnel and operations manager for the chain, convened the entire workforce, scheduling separate meetings for the day and night shift employees. Addressing the day employees first, Costello discussed the union campaign and the effect of signing authorization cards. He then asked if the employees had any problems. Two subjects were raised: health insurance and the establishment of a grievance committee. Costello agreed to investigate both proposals. He explained that if implemented, a health insurance plan would cover all stores in the Rich's chain, not just the Plymouth branch, and would be jointly financed by management and the employees.

On May 10 Costello met with a group of 15 or 20 night shift employees. This group's reaction to the two suggestions made by the day personnel was favorable. Costello told them that a grievance committee procedure would be established and that management would pursue the proposal for health insurance.

A short time later a grievance committee ballot box was installed in the Plymouth store. Two days later it was removed. After the May 10 meeting, no further mention was made of the health insurance proposal. Store supervisors were directed to answer any inquiries about the progress of the employees' suggestions by stating that the company "had been advised not to go into this at this point."

Early in May respondent instituted a pay increase of 5 cents per hour for all employees in the chain. On May 14, the union filed a petition with the Board to represent

the Plymouth store workforce.[1] An election was conducted on July 22 in which the union lost by a margin of 41 votes to 22, with 7 ballots challenged. Subsequently the union filed unfair labor practice charges and sought to have the election overturned.

We sustain the Board's conclusion that respondent violated section 8(a)(1) of the Act by soliciting employee grievances and promising benefits during the pendency of this union campaign. One indication that the grievance sessions conducted in this case could be found to have been calculated to infringe upon the employee freedom of choice with respect to unionization, *NLRB v. Exchange Parts*, 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964), is their timing. Ordinarily, the more imminent a representational election, the greater the presumption that management's expression of concern for employee welfare has an impermissible motive, *see NLRB v. Styletek, Division of Pandel-Bradford, Inc.*, 520 F.2d 275, 277 (1st Cir. 1975). Here an election had not yet been requested at the time the employees were convened and additional benefits were discussed, a fact seemingly in respondent's favor, *see id.* However, it appears to be no mere coincidence that Costello called for the meetings, inquired of the day employees' grievances, and promptly responded to their suggestions the very day the union had chosen for its first organizational meeting. We think it reasonable to conclude that the grievance sessions were timed to nip the union effort in the bud.

The manner of convening the workforce adds support to the Board's finding. Neither grievance session was a regularly scheduled event, *see NLRB v. South Shore Hospital*, 571 F.2d 677, 681 (1st Cir. 1978). The meetings were not called by the employees, but were initiated by management, and concededly in response to the union presence at the store, *see NLRB v. Gotham Industries*, 406 F.2d 1306, 1311 (1st Cir. 1969). Costello asked for the employees' proposed improvements promptly after having acknowledged that the union was attempting to organize. When contrasted to respondent's characteristic method of dealing with employee complaints on an individual, informal basis, convocation of the entire workforce conveyed the impression that with a union campaign in progress, employee suggestions would be taken more seriously.

Some evidence, although it was specifically discredited by the administrative law judge, indicates that the proposal for a health insurance plan may at least have been considered by management prior to the union's appearance at the Plymouth store, *see NLRB v. Arrow Elastic Corp.*, 573 F.2d 702, 706 (1st Cir. 1978). Even if that were the case, it would not mitigate the effects of respondent's conduct. No specific details of such a plan were communicated to the employees prior to April 26, nor did management ever unconditionally commit itself to providing health insurance, *id.; NLRB v. Exchange Parts, supra*, 375 U.S. at 409, 84 S.Ct. 457. In any event, there is no basis for believing that the second improvement discussed with the employees at the same time, establishment of a grievance committee, had been predetermined, *see NLRB v. Arrow Elastic Corp., supra*. That idea originated with the day employees at the April 26 meeting. No business justification was even offered for management's sudden interest in it, *see NLRB v. Otis Hospital*, 545 F.2d 252 (1st Cir. 1976).

Respondent seeks support in the fact that whatever promises may have been made at the meetings were never put into effect.[2] In what appears to have been a

1. It is unclear from the administrative law judge's report whether the wage increase was implemented before or after the union filed its petition with the Board. The precise date is unimportant, for it is conceded that at the time the increase went into effect respondent was aware of the union activity in its Plymouth store, *see NLRB v. Gotham Industries, Inc.*, 406 F.2d 1306, 1310 (1st Cir. 1969).

2. The administrative law judge found that the benefits discussed at the meetings were never actually conferred. There is no claim on appeal that respondent committed a separate unfair labor practice by withholding promised

belated effort to avoid a probable unfair labor practice charge, respondent removed the grievance committee ballot box before an election could be held, made no further mention of the proposal for health insurance, and gave an explanation for its action which was carefully phrased to avoid reference to the union. As we have noted in previous decisions, we are not insensitive to attempts by an employer to mitigate impermissible conduct, see *Sta-Hi Division, Sun Chemical Corp. v. NLRB*, 560 F.2d 470, 474 (1st Cir. 1977). Once the promises had been made, however, the requisite laboratory conditions for a representational election had been destroyed, and even good faith efforts to blunt their impact could not make it otherwise, *id.*

 Similarly, we agree with the Board that the implementation of a 5 cent per hour pay increase violated section 8(a)(1). Although it is not invariably an unfair labor practice to increase compensation while a union campaign is underway, such conduct makes out a prima facie case of intentional interference with employee organizational rights, see *NLRB v. Styletek, supra*, 520 F.2d at 280.[3] The burden then shifts to the employer to justify both the fact and the timing of the increase, *id.*

Respondent argues that it carried that burden by introducing evidence that the decision to increase wages was made in January, 1976, before the union made its presence known, and was implemented pursuant to a consistently applied policy of granting raises in the spring and fall of each year, see *D'Youville Manor v. NLRB*, 526 F.2d 3, 5 (1st Cir. 1975). However, the administrative law judge and the Board discredited testimony by respondent's president that by January, 1976, management had resolved to increase wages. We have no basis for disturbing that finding, based as it was on an assessment of credibility,

see *NLRB v. Garland Corp.*, 396 F.2d 707, 709 (1st Cir. 1968).

Similarly, the Board was unpersuaded, and we think with good reason, by the argument that the timing of the raise was in line with pre-existing company policy. Between 1972 and 1974 wages were increased every six months, in April and October. That pattern was interrupted in 1974 and subsequent increases, mandated by changes in federal minimum wage requirements, were instituted in May, 1974, January, 1975, and January, 1976. The next voluntary pay increase was not until May, 1976. No evidence indicates that the employees had any expectation that they would receive the 5 cent raise, much less that it would be in that month. Since respondent had only once given a raise in May, and that had been two years prior to the period in question, we, like the Board, are unconvinced that respondent had a history of showing its munificence in May. Respondent's conceded awareness of the union presence at the time it put the increase into effect undermines its argument all the more, see *NLRB v. Arrow Elastic Corp., supra*, at 704; *NLRB v. Gotham Industries, supra*, 406 F.2d at 1310. On these facts it appears that even if it might have been decided in advance, the wage increase was "sprung on the employees in a manner calculated to influence the employees' choice", *NLRB v. Styletek, supra*, 520 F.2d at 280.

### Impression of Surveillance

 We are somewhat more troubled by the Board's finding that respondent violated section 8(a)(1) by creating an impression of surveillance among its employees. Late in a working day toward the end of April, 1976, a store employee approached Aida Pereira, a union supporter, to ask for her telephone number. According to Pereira, she did not have any paper, and so wrote the number on the back of a blank union authorization card. Steven Rice,

benefits, see *NLRB v. Otis Hospital*, 545 F.2d 252 (1st Cir. 1976).

**3.** Whether well timed raises create a rebuttable presumption of a violation, as the Board found, or a prima facie case of misconduct, is immaterial to the disposition of this case. In either event the company was called upon to present substantial evidence in opposition to the charge, see *NLRB v. Styletek, Division of Pandel-Bradford, Inc.*, 520 F.2d 275, 280 (1st Cir. 1975). It failed to do so.

then the store manager, called Pereira aside and said, "Aida I know that you are responsible for this." The administrative law judge concluded that although Rice's statement was "less than explicit", in view of the other unfair labor practices respondent had committed and the fact that a union authorization card was involved in the incident, an impression of surveillance had been created.

Part of our difficulty with this conclusion stems from the fact that this episode was short-lived and appeared to be the only one that occurred during the entire union campaign, see *Stone & Webster Engineering Corp. v. NLRB,* 536 F.2d 461, 468 (1st Cir. 1976); *NLRB v. Garland Corp., supra,* 396 F.2d at 709. Rice's comment was at best vague, and contained no reference to the union, or threat of reprisals, see *NLRB v. Sandy's Stores,* 398 F.2d 268 (1st Cir. 1968); *NLRB v. Prince Macaroni Mfg. Co.,* 329 F.2d 803 (1st Cir. 1964). Even if Rice had mentioned the union, Pereira was known to management as a union supporter, see *Hedstrom Co. v. NLRB,* 558 F.2d 1137, 1144 (3d Cir. 1977).[4] The Act does not prevent an employer from acknowledging an employee's union activity, without more, see *NLRB v. Mueller Brass Co.,* 509 F.2d 704, 709 (5th Cir. 1975). Nevertheless, "[b]ecause this finding is largely grounded on the fact finder's judgment concerning the credibility of the witness and on unrefuted testimony, we conclude that it was supported by substantial evidence and should not be disturbed", see *Stone & Webster v. NLRB, supra,* 536 F.2d at 468.

### Refusal to Rehire

It is at the point of reviewing the finding that a section 8(a)(3) violation occurred that

we part company with the Board. Jean Schembri, the employee in question, was one of two employees who worked at a jewelry concession in the Plymouth store.[5] Evidence indicated that on several occasions she had expressed interest in the union to respondent's supervisory personnel.[6]

On July 9, 1976 Schembri reported for her evening shift. Customarily a busy night, that Friday promised to be especially so, since an ear piercing clinic was to take place. Schembri approached the concession manager Mary Fontaine and the supervisor Dottie McDonald to inquire about holiday pay she had claimed, after advice from the union, but not received and to renew a complaint about a reduction in the number of hours she had been scheduled to work. When Fontaine informed her she was expected to work at an ear piercing clinic to be held the following day, Schembri protested that she had not been notified of this. Fontaine pointed out that the schedule had been posted two days earlier. Displaying some anger, McDonald suggested that she and Fontaine leave. Schembri asked to speak to McDonald and returned to her station, apparently expecting McDonald to follow. When she discovered that McDonald had left the concession without talking to her, Schembri stormed over to the service desk, announced to assistant store manager Croteau that she was quitting, and told him to find a replacement for her. After giving a substitute employee brought over from the service desk some instruction on preparation for the ear piercing clinic, Schembri left.

Soon after she returned home, Schembri informed Fontaine by telephone that she

---

4. This can be inferred from the fact that by Pereira's own testimony, at some point after management's meetings with the day and night shift employees, but before this incident, personnel manager Costello asked for her reaction to the proposal for implementing health insurance. Pereira responded that she "wanted union representation".

5. Although independently owned, the concession was operated under the supervision of Rich's employees.

6. Schembri recounted to the administrative law judge a series of conversations with the concession manager which, if believed, would have indicated some anti-union animus on the part of the supervisory personnel. Favorably impressed by the manager's demeanor, and unconvinced by Schembri's testimony, which he termed "hostile and robot-like", the administrative law judge disbelieved Schembri's version of these discussions, except where corroborated by the manager.

had quit. Several hours later she again called Fontaine, apologized, and asked for her job back. Fontaine responded that although Schembri had been a good employee, the matter was up to management. She agreed to relay Schembri's desire to be re-hired to McDonald, but noted that the latter was upset with Schembri because of her comments about the union. Several telephone calls with various supervisory personnel and the concession owner followed, but Schembri was not reinstated. Two days later a replacement was hired.

Both parties treat this case precisely the same as one in which there has been an allegation of an unlawful discharge and seem to have assumed that the employer had an obligation to come forward with an explanation for its failure to reinstate Schembri.[7] That premise does not strike us as so obvious. Schembri was not discharged, impermissibly or otherwise, *see, e. g. Stone & Webster v. NLRB, supra,* 536 F.2d 461. Nor was it ever argued that, by walking off her job, she joined in concerted activity protected by the Act, *see NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 378, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); *Bob's Casing Crews, Inc. v. NLRB,* 429 F.2d 261, *after remand,* 458 F.2d 1301 (5th Cir. 1972); *Colson Corp. v. NLRB,* 347 F.2d 128 (8th Cir. 1965). Rather, she unilaterally and precipitously quit her job for a reason unconnected to her union sympathies, *see LTV Electrosystems, Inc. v. NLRB,* 408 F.2d 1122, 1127 (4th Cir. 1969); *NLRB v. J. W. Mays, Inc.,* 356 F.2d 693, 695 (2d Cir. 1966).

Under such circumstances Schembri's rights seem to us to approximate more closely those of a job applicant than those of a discharged employee. Just as union membership or sympathy has not been regarded as an insurance policy for job placement, it cannot assure that an employee who quits and then changes her mind will be reinstated, *see NLRB v. Plymouth Cordage Co.,* 381 F.2d 710, 711 n. 2 (5th Cir. 1967). An employer who refuses to reinstate an employee who voluntarily terminated is arguably in a stronger position to defend its action than one who has discharged the employee. By the same token a correspondingly heavier burden might rest on the Board to prove a section 8(a)(3) violation, *see Champion Papers, Inc. v. NLRB,* 393 F.2d 388, 394-95 (6th Cir. 1967).

Nevertheless, we do not rest our decision on any such difference in defenses and burdens. Even assuming that in both circumstances the employee has the same right to reinstatement judged against the same standard, we conclude that the Board erred in finding that respondent's refusal to rehire Schembri violated section 8(a)(3).

It was conceded here that management was aware of Schembri's interest in the union movement at the time it was confronted with her request for reinstatement, *compare Stone & Webster v. NLRB, supra,* 536 F.2d at 464, *with NLRB v. Joseph Antell, Inc.,* 358 F.2d 880, 882 (1st Cir. 1966). There is also evidence that management demonstrated some hostility toward the union effort. However, management alleged, and offered supporting evidence, that it had refused to rehire Schembri not on that basis, but because she had left them in the lurch at an especially bad time. Respondent having offered a legitimate business justification for its conduct, the burden shifted to the Board to establish by substantial evidence "an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one", *NLRB v. Billen Shoe Co.,* 397 F.2d 801, 803 (1st Cir. 1968). In our repeated efforts to impress this standard upon the Board we have variously redefined it to mean that the decision would not have been made "but for" the employee's union activity, *Coletti's Furniture, Inc. v. NLRB,* 550 F.2d 1292, 1293 (1st Cir. 1977), that union animus was the "dominant" reason, *NLRB v. Lowell Sun Publishing Co.,* 320 F.2d 835, 842 (1st Cir. 1963), or the "controlling" motive, *NLRB v. Fibers Int'l Corp.,* 439 F.2d 1311, 1315 (1st Cir. 1971). By whatever phraseology, we have attempted to make it clear that "the mere existence of anti-union animus is not

---

7. The briefs cite pretext dismissal cases.

enough" to make out a section 8(a)(3) violation, *NLRB v. Billen Shoe, supra,* 397 F.2d at 803.

 Here the administrative law judge, upheld by the Board, acknowledged that respondent had asserted a business reason for its conduct, but dismissed it as "improbable" and concluded that "but for" the union activity, Schembri would have been rehired.[8] While the magic words may have been invoked, that is not enough, *see Coletti's Furniture, supra,* 550 F.2d at 1293. Our standard must also be reasonably applied to the facts at issue, *id.* We are unable to convince ourselves that this was done.

This case is unlike *Champion Papers Inc. v. NLRB, supra,* 393 F.2d at 394, for example, where the asserted reason for the employer's action, "dissatisfaction" and "attitude", appeared unsubstantiated or inconsequential. Here respondent's refusal to rehire Schembri had a sound basis in business judgment. The only employee at the jewelry counter, Schembri had walked out in a fit of temper at the outset of one of respondent's busiest retail nights, requiring the supervisors to draft an untrained last minute substitute from one of the other departments. An employer's unwillingness to rehire an employee who demonstrated such irresponsibility and lack of consideration is quite understandable. Moreover, respondent presented evidence to the administrative law judge that it had acted in accordance with a pre-existing policy of refusing to reinstate employees who quit without notice or a valid excuse.

 The Board summarily dismissed the proffered reason as "improbable", *see NLRB v. Fibers Int'l Corp., supra,* 439 F.2d at 1315, and asserted that respondent's rein-

statement policy was the exact opposite of what respondent asserted it to be, i. e., that in the past respondent had always rehired employees who terminated voluntarily, and had failed to do so only in this case. The Board's assertion is belied by the record. Of the two examples the Board relied upon to reach its conclusion, one concerns a rehired employee who *had* given notice prior to resigning. The other relates to a young boy who was discharged for stealing. He was indeed rehired, but only after his parents managed to persuade respondent that the boy had learned his lesson. In *all* instances of voluntary termination without notice or explanation cited in the record, the employees in question were not reinstated and it was noted in their personnel files that they were ineligible for rehire.[9] *See NLRB v. Murray Ohio Mfg. Co.,* 326 F.2d 509, 514 (6th Cir. 1963).

In sum, Schembri genuinely quit without notice on her own volition at a pressing time over a matter wholly unrelated to any concerted activity or bargaining. The employer's professed reason for refusing to rehire her not only is readily understandable as a matter of common sense but was in conformity with a written policy which was, contrary to the Board's analysis, faithfully followed. While the employer knew that Schembri was a union supporter, there is nothing to indicate that she was other than rank-and-file. All that is left is that management representatives had demonstrated some hostility toward union efforts in conversations with Schembri and had committed some illegal actions in other contexts. On this record we find this to be insufficient evidence of dominant antiunion motive to overcome the legitimate business

---

8. Inclusion of the phrase "but for" constitutes the only reference in the administrative law judge's memorandum to any standard. No decision of this court was cited, *see NLRB v. Fibers Int'l Corp.,* 439 F.2d 1311, 1312 (1st Cir. 1971), and there was no elaboration on the "but for" language.

9. That Schembri had been considered a competent employee and it may arguably have been in respondent's interest to bend policy in order to rehire her does not refute the legitimacy of

respondent's refusal to do so. The business justification was within respondent's realm to make, *see Champion Papers, Inc. v. NLRB,* 393 F.2d 388, 394 (6th Cir. 1967). It is neither the Board's function, nor indeed ours, to second-guess business decisions. "The Act was not intended to guarantee that business decisions be *sound,* only that they not be the product of antiunion motivation", *Stone & Webster Engineering Corp. v. NLRB,* 536 F.2d 461, 467 (1st Cir. 1976) (emphasis in original).

888

justification for respondent's conduct, *see Stone & Webster v. NLRB, supra,* 526 F.2d at 465; *NLRB v. Puerto Rico Telephone Co.,* 357 F.2d 919, 920 (1st Cir. 1966); *NLRB v. Bird Machine Co.,* 161 F.2d 589, 591 (1st Cir. 1947).

In *Coletti's Furniture, Inc. v. NLRB, supra,* 550 F.2d at 1293, we noted that after such repeated and unambiguous interpretation "there can be little reason for us to rescue the Board hereafter if it does not both articulate and apply our rule". Our rescue mission stops here. So much of the Board's order as directs that Schembri be reinstated with back pay is set aside. That portion of the order as concerns the violation of section 8(a)(1) is enforced.

*So ordered.*