NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

CALL, BURNUP AND SIMS INC., Respondent.

No. 6993.

United States Court of Appeals First Circuit.

Heard Feb. 6, 1968.

Decided April 12, 1968.

Norton J. Come, Atty., Washington, D. C., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Allison W. Brown, Jr., and Linda Sher, Attys., Washington, D. C., were on brief, for petitioner.

Ray C. Muller, Miami, Fla., with whom Muller, Schenerlein & Bare, Miami, Fla., was on brief, for respondent.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

In this case the National Labor Relations Board found that respondent, Call, Burnup and Sims Inc., violated sections 8(a) (5) and (1) of the National Labor Relations Act by failing to negotiate in good faith with the union;[1] further, that the respondent provoked an unfair labor practice strike and violated sections 8(a) (3) and (1) of the Act by refusing to reinstate the strikers. On these findings the Board entered its order which, among other things, required the respondent to cease and desist from their unfair labor practices, offer the strikers reinstatement and make them whole for any losses suffered by reason of the company's refusal to reinstate them and to bargain with the union.

The pertinent facts may be summarized as follows. On December 17, 1964, the union filed an election petition with the Regional Director seeking a representative election among the employees in respondent's concrete pumping division in Puerto Rico. Shortly thereafter one Rey, manager of this division, met with the employees as a group and in many cases individually. He tried to dissuade them from any interest in the union, stating that he was only recently on the job, had been good to them and that the advent of a union would adversely affect his position with the company. Also he warned that the company might curtail its operations and take other steps inimical to the employees.

1. Union Obreros Cemento Mexclado.

After consultation with one Fuentes, the vice-president of respondent company, and on the advice of an attorney, Rey assembled the employees again and presented them with a paper. This paper stated that working conditions at the plant were good and that there was no need of a union. Rey told the employees that they could sign or not as they chose but in fact all or substantially all those present signed the paper.

Thereafter but before the election, which was held on January 29, 1965, the president of respondent's parent company and also the officer in overall charge of labor relations, was advised of the situation. He directed both Fuentes and Rey to cease their activities concerning the union and gave one Muller, respondent's regular labor relations attorney, overall responsibility. At Muller's suggestion Rey delivered two speeches to the employees in which he made clear that they were at liberty to choose the union or not as they saw fit.[2] The union won the election and was certified as bargaining representative.

In April 1965 an employee named deLeon Rodriguez went to see Rey claiming to be a union delegate. Rey told him and thereafter told all the employees that while he was willing to discuss grievances with individuals, he had no intention of dealing with deLeon Rodriguez in a representative capacity. It is by no means clear that this employee was a duly authorized union delegate but it does appear that Rey refused to deal with him not for this reason but because he believed that he did not have to deal with any union representative in the absence of a contract.

Also in April 1965 the union delivered a copy of a proposed contract to Rey and requested negotiations thereon. This gave rise to a lengthy exchange of communications the details of which need not be related here. Suffice it to say that whereas the proposed contract was in Spanish, respondent insisted that a translation be supplied and that negotia-

tions be conducted in English. The union asserted that Spanish should be the language of the negotiations. Bit by bit the union yielded, first supplying a translation of its contract proposal and later proposing that there be an interpreter, the expense to be shared by the parties. Respondent, however, adhered firmly to its original position.

This exchange of correspondence occurred between April 6 and August 16, 1965. On July 23 the employees decided that they would no longer work without a contract and so informed Rey. When he told them either to go to work or leave the premises nine went out and the remaining four went to work. A few weeks later, with the strike apparently something less than a complete success, the strikers returned only to be told that new men had filled their jobs.

■ It is undisputed that the parties have a duty to bargain in an open and sincere manner. The dispute here centers not around the law but its application to the facts. The decision that a party has or has not negotiated in good faith involves, of course, an assessment of intent.

■■ We cannot say that the Board misconceived respondent's intentions in this case, especially when due allowance is made for the flexibility to be accorded the Board in matters such as these. N. L. R. B. v. Insurance Agents' Int'l Union, 361 U.S. 477, 498, 80 S.Ct. 419, 4 L.Ed. 2d 454 (1960). It would be something of an understatement to say that Rey conveyed to the employees the impression that his attitude towards the formation of a union was uncongenial. We are told, however, that Rey did not speak for respondent because he was not a specialist in labor relations. Passing over this somewhat novel theory of agency and the fact already noted that respondent never really disavowed Rey's earlier activities, it is enough to recall that Rey himself believed that the advent of a union would jeopardize his own future with the com-

2. Rey's former conduct was not disavowed except insofar as this is implicit in these speeches.

pany. He so informed the employees, pleading with them to forego the idea.

Nor do we rely solely on things as intangible as respondent's general hostility to unions. On two different occasions Rey refused to deal with an employee who represented himself as a union delegate. It may be that technically he was not a delegate but since Rey did not rely on this factual question at the time, his refusal to deal with the employee on other than an individual basis is instructive.

Especially significant, we think, is the correspondence of the parties in regard to the language dispute. Respondent maintains that he had no obligation to negotiate in Spanish. The Board, however, did not say that respondent had an obligation to negotiate in Spanish or even that it had to do any specific thing to bring the dispute to an amicable conclusion; rather that "[r]espondent's failure to show at least the same spirit of accommodation in solving the language problem as it does in solving communication problems involving work instructions discloses an unwillingness on its part to approach bargaining with the requisite good faith." It is incumbent upon each party to contribute to the solution of problems preliminary to negotiation. See N. L. R. B. v. Insulating Fabricators, Inc., 338 F.2d 1002 (4th Cir. 1964) (per curiam), enforcing, 144 N. L. R. B. 1325. While the union suggested various devices to remove this threshold problem, respondent offered nothing more imaginative than an adamant repetition of its original position. While it may be that respondent believed that simple justice required the total capitulation of the union on this point, its position is also susceptible of the interpretation that it was not really anxious that this basic impediment to negotiations be removed.

■ There is the additional question of whether the strikers were entitled to their jobs when they returned to work, that is, whether the strike was an unfair labor practice strike. A strike may be an unfair labor practice strike even if motivated in part by economic objectives. N. L. R. B. v. Sea-Land Service, Inc., 356 F.2d 955, 965 (1st Cir.), cert. denied, 385 U.S. 900, 87 S.Ct. 205, 17 L.Ed.2d 131 (1966). Simmons, Inc. v. N. L. R. B., 315 F.2d 143 (1st Cir. 1963), cited by respondent, says nothing that is inconsistent with the Sea-Land case but merely suggests that there may be extreme factual situations in which the principle would find no application.

■■ The nub of the matter here is that the Board claims that the strike resulted from respondent's refusal to negotiate whereas respondent claims that the strike resulted from its refusal to sign the contract as offered by the union. It does appear from the record that the employees misunderstood the implications of the vote in favor of the union. They seemed to think that there was some pre-existing entity called "the contract" which the election obliged the company to sign. But the employees' lack of legal sophistication is not controlling. They realized, if only in a general manner, that they were entitled to something and that the dilatory tactics of the respondent prevented their getting it. They will not be deemed to have forfeited rights simply because they understood them only imperfectly. Cf. N. L. R. B. v. Electronics Equipment Co., 194 F.2d 650 (2d Cir. 1952). Indeed it is precisely when employees, whether through inexperience or ignorance, are baffled by the complexities of the law that the courts must be solicitous of their rights. A strike caused by delay of the employer in negotiating a contract is an unfair labor practice strike. N. L. R. B. v. Southland Cork Co., 342 F.2d 702 (4th Cir. 1965). We are unwilling to say that when employees, unaware of the implications of the distinction, refer to "the contract" rather than "a contract," this converts the strike into an economic one.

■ There is one final point. Before the Board, respondent contended that three of the employees were properly denied reinstatement because of their conduct during the strike. These three apparently were charged with criminal violations and the question was whether this occurred before the strikers request-

ed reinstatement. Because the Board did not resolve this question, the issue of whether respondent's duty to reinstate should be modified to exclude them was left to the compliance stage. Since, however, respondent has provided no further information on this point, there is no basis for such modification.

Upon a review of the entire record we are satisfied that the Board's findings are supported by substantial evidence.

The Board's order will be enforced.