**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GARLAND CORPORATION, Respondent.**

No. 7054.

United States Court of Appeals First Circuit.

June 28, 1968.

Peter M. Giesey, Atty., Washington, D. C., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Allison W. Brown, Jr., and Herbert Fishgold, Attys., National Labor Relations Board, Washington, D. C., were on brief, for petitioner.

George H. Foley, with whom Hale & Dorr, Boston, Mass., was on brief, for respondent.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

The National Labor Relations Board petitions this court for enforcement of its order against the respondent, Garland Corporation. The Board found that respondent, through statements made by three of its supervisors, interfered with, restrained or coerced its employees in violation of § 8(a) (1) of the Act and issued its order accordingly.[1]

The events that occasioned the instant dispute arose when the International Ladies' Garment Workers' Union, AFL-CIO (the union) began an organizing campaign at respondent's plant. After the union demanded recognition, respondent's plant manager called a meeting of the approximately sixty plant supervisors and instructed them as to appropriate behavior during the organizational drive. It is undisputed that he emphatically directed these supervisors not to question employees concerning their voting intentions nor in any way interfere with their freedom of action in voting. He did tell them that they might properly point out the benefits that had accrued to the employees as a result of company policies.

Thereafter the plant manager also addressed the production employees.[2] He told them in vigorous terms that how they voted in the upcoming election was their own business and that if any supervisor threatened them or promised them anything they should call the matter to his personal attention.

The three incidents that triggered the Board's order may be summarized as follows. 1. One Baqueriso had conversations concerning the union with Stallard, his immediate supervisor.[3] Baqueriso testified that Stallard had remarked to him that the union would not be able to obtain benefits such as were available at Garland; further, that Stallard asked him whether he had signed a union authorization card, to which Baqueriso replied that he had not. Stallard acknowledged he had stated that Garland offered benefits superior to those available at some union plants with which he had experience but denied inquiring whether Baqueriso had signed a union card. The Board credited Baqueriso as indeed it did all the employees who testified.[4]

2. Some time after the plant manager's meetings with the supervisors and employees, one Gladys Appt had a conversation with supervisor Irma Johnson. Mrs. Appt testified that after inquiring whether she had been visited at her home by union organizers—to which the response was no—the supervisor suggested that the advent of the union would probably result in the loss or diminution of certain company benefits. Specifically mentioned, among others, were Christmas bonus, vacation pay, company medical clinic and overtime. The supervisor, on the other hand, testified that after beginning with the remark that she didn't know whether Mrs.

1. The order required the company to cease and desist from the unfair labor practices found and to post the customary appropriate notices.

2. He addressed the more than six hundred employees in approximately twenty smaller groups.

3. These conversations took place before the plant manager addressed the employees and perhaps before he addressed the supervisors. Moreover, in view of Basqueriso's claim that he spoke very little English and Stallard's claim that he spoke very little Spanish, it is remarkable that they took place at all. The Board concluded that Stallard's Spanish was better than he acknowledged.

4. In crediting Baqueriso the Board adverted to a prehearing statement to respondent's attorney in which Baqueriso admitted that Stallard had not asked him whether he had signed a union card. The Board declined to attach significance to this statement, however, on the ground that there was no evidence that Baqueriso was assured that he could testify without fear of reprisal.

Appt had signed a union card or not, she merely spoke words of praise concerning the benefits already in existence at Garland, while disclaiming any knowledge concerning what would happen if the union were successful in its organizational drive.

3. The final incident was a conversation between employee Virginia White and supervisor Amelia LaFave. This conversation also took place after the speeches of the plant manager above mentioned. According to this employee the supervisor said "if the union got in we could lose benefits," without specifying what those benefits might be; moreover, that Garland was considering giving another holiday. Supervisor LaFave conceded only that she asked White whether the latter had received a copy of the company book that outlined the work benefits available at Garland.

In all three instances the employees testified that the supervisors had indicated that union success would unfavorably affect the working conditions of Garland employees and in each instance the supervisor denied this. The Board, as already noted, credited the employees.

■ The trial examiner's decision, which the Board adopted, states that "the fundamental issue in this case is one of credibility." If this were the issue, we could agree with the Board's disposition of the case since it is well within the Board's province to prefer the testimony of the employees, especially in view of the credibility evaluation of the trial examiner. See N. L. R. B. v. Gass, 377 F.2d 438, 443 (1st Cir.1967). It seems, however, that the more fundamental question is whether these three incidents, considered in their total context, are sufficient to justify finding re-

spondent guilty of unfair labor practices, even assuming that they occurred substantially as the employees testified. We think not.

■ To begin with, there were only these three isolated events in a plant comprising some six hundred employees and sixty supervisors. We are told now that undoubtedly these conversations were passed on from employee to employee by word of mouth, thus increasing their over-all impact. This theory is not analytically inevitable, since the above stated conversations were not such as to become a conversation piece among the employees. Further, we will not now speculate about a matter on which testimony could easily have been elicited if it had been thought important. But see discussion of Irving Air Chute Co. v. N. L. R. B., infra n. 5 ¶2. We do not say that these incidents are in themselves *de minimus* but we do say that they are not sufficient to constitute a repudiation of the policy of noninterference announced by the plant manager to supervisors and employees alike.

■ Petitioner contends, with appropriate citations, that employers are liable for the conduct of supervisors when the employees have reason to think that they are acting on behalf of the company; that what the supervisors say and not what they are told to say is what counts and that lip-service to the policy and purpose of the Act is not sufficient. We see no reason to quarrel with these propositions but we think they are inapplicable to the facts of this case. Here there is no pervasive scheme of coercion demonstrating that the policy of non-interference was announced with tongue in cheek.[5] Rather, we have only three relatively minor incidents by

---

5. Petitioner quotes Irving Air Chute Co. v. N. L. R. B., 350 F.2d 176, 179 (2d Cir. 1965) to the effect that "Evidence of the dissemination of the Company's threats or that they were part of an organized program of coercion is also not required." In that case, however, one supervisor who observed an employee carrying union literature asked "if he were trying to get himself fired." The

supervisor then said that successful union organization might cause the company to move its plant to Kentucky. Three days later a second company official, this time the plant manager, told the same employee that he, the plant manager, had orders to fire all union agitators among the employees and that there would be reprisals against members of the paint department (where this employee worked) because of

junior company officials that fly in the face of the instructions of a plant manager whose sincerity has been in no way impugned.[6] See E. I. Du Pont de Nemours v. N. L. R. B., 116 F.2d 388, 400 (4th Cir.1940), cert. denied, 313 U.S. 571, 61 S.Ct. 959, 85 L.Ed. 1529 (1941), where the court held that half a dozen isolated and unrelated incidents, in a labor force of more than 2,000 employees, that ran counter to employer's instructions would not support a finding of unfair labor practices. In N. L. R. B. v. Ace Comb Co., 342 F.2d 841 (8th Cir. 1965) and N. L. R. B. v. Bird Machine Co., 161 F.2d 589 (1st Cir.1947), where instructions to supervisory employees not to make coercive statements did not relieve employer of imputed liability it is indicated that it might be otherwise if these instructions had been communicated to the employees. See also N. L. R. B. v. England Brothers, 201 F.2d 395 (1st Cir.1953); cf. N. L. R. B. v. Call, Burnup & Sims, 393 F.2d 412 (1st Cir. 1968).

■ We cannot say that on the record as a whole the Board's findings of § 8(a) (1) violations are supported by substantial evidence. This was a sizable plant, with a very large number of supervisors. The employer exhibited broad and sustained efforts to inform the employees of its determinedly neutral position. Infractions when minor in themselves must be viewed in perspective. The Board cites no case where an employer has been condemned for an unfavorable record as insubstantial as this and we have no wish to be in the vanguard.

A decree will be entered setting aside the order of the Board.

---

their union activity. Although the incident with the first supervisor involved far more serious matters than anything involved in the present case, the court relied principally on the incident involving the plant manager, an incident that has no parallel in the instant case.

Also, the presumption in that case that the company's threats were disseminated to other employees must be read in light of the fact that (a) the plant manager was involved in the major incident, and (b) he specifically spoke of reprisals against other employees.

6. Petitioner points out that the Company took no positive action to effectively repudiate the supervisors' statements. There was no evidence, however, that these conversations were ever called to the attention of higher officials of the Company. Here, too, we are reluctant to supplement the record with speculation.