**HUBBARD REGIONAL HOSPITAL,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 77-1454.

United States Court of Appeals,
First Circuit.

Argued April 4, 1978.
Decided June 21, 1978.

Jerome N. Weinstein, Boston, Mass., with whom Sydelle Pittas and Herrick & Smith, Boston, Mass., were on brief, for petitioner.

Marjorie S. Gofreed, Atty., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Joseph A. Oertel, Atty., Washington, D. C., were on brief, for respondent.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

This case arises on a petition for review and cross-application for enforcement of an order of the National Labor Relations Board finding violations of section 8(a)(1) of the National Labor Relations Act based on unlawful threats and promises of benefits and a finding of a violation of sections

8(a)(1) and (3) for unlawful discharges.[1] Respondent's position as to the discharges is that the employees were discharged for a legitimate business purpose and that the Board failed to articulate and administer the proper standard for determining the motivation of the employer. It contends that the alleged violations of section 8(a)(1) were nonexistent or so trivial in nature as to preclude enforcement of the order.

We deal first with the facts and law surrounding the allegedly unlawful discharges. The essential facts, which are not really in dispute, are summarized from the administrative law judge's opinion.[2] The nurses employed by the respondent hospital formed an independent union, Community Nurses Association (CNA), in 1975. An election was held, and CNA was certified in May of 1975. Unable to successfully negotiate a contract, CNA voted to affiliate with District 1199 Massachusetts, National Union of Hospital & Health Care Employees (the Union). As a result of petitions filed by the Union on January 14 and February 4, 1976, elections were directed for two units: technical and service employees, and registered and practical nurses. Elections were conducted on June 10, 1976, and the Union lost by a significant majority in each unit.

### THE DISCHARGES

In early April of 1976, Edward Soltys, husband of Patricia Soltys who was Assistant Director of Nursing and, therefore, a supervisor, was admitted to the hospital with jaundice of an undiagnosed origin. Soltys was placed in isolation because of the possibility that he had infectious hepatitis, one of the most frequent causes of jaundice. Stringent precautions were taken to render the spread of any infection unlikely. Since the cause of the jaundice was not determined after a week in the hospital, exploratory surgery was scheduled for April 9.[3] The day before surgery was scheduled, Geraldine Siegmund, head nurse for Unit D where Soltys' room was located, obtained Mrs. Soltys' signature for an operation on a consent form and, at the conclusion of their conversation, commented that she guessed they would have to wrap Mrs. Soltys' husband in a plastic sheet when they transported him to surgery because of the possibility of his having a contagious condition. Mrs. Soltys wished her husband good luck that evening; she did not plan to see him before the operation the next morning because she knew he would be given preoperative medication and she did not think that her presence would make him feel any less apprehensive about the impending surgery.

On Friday morning, April 9, Soltys was prepared for surgery by the night shift nurses. Sedatives were administered as part of the preoperative procedure. Registered Nurses Siegmund, Sharon Allard, and Susan Fjellman and Licensed Practical Nurse Marlene Plaza came on duty at 7:00 A.M. It was their responsibility to complete preparations for surgery and to take Soltys to the operating room. Normal procedure would be to put a hospital gown on the patient, place him on a stretcher and cover him with two bath blankets. Because of the possibility of Soltys' condition being contagious, a surgical mask might also be

1. 8(a)(1) and (3):
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [29 U.S.C.A. § 157];
   .  .  .  .  .
   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization
   .  .  .  .

2. The opinion of the Board, which adopts the findings of the administrative law judge, and his opinion, are reported at 232 N.L.R.B. No. 130 (1977).

3. One of the things that precipitated the exploratory operation was the suspicion that Soltys might have cancer. Mrs. Soltys testified that she had told Siegmund that there was a possibility of cancer prior to the operation. Siegmund and the others testified that they did not know about suspected cancer until after the operation. The administrative law judge credited the testimony of Siegmund on this question and discredited Mrs. Soltys' testimony.

used. There was uncredited testimony that a surgical cap was sometimes used in contagious cases. Normally, a patient is transported to the operating room by two hospital employees.

After the preoperative checklist items were completed, Plaza and another nurse, Sharon Haagsma, not a participant in the bizarre incident that followed, put a hospital gown on Soltys, placed him on a stretcher and covered him with two bath blankets. Nurses Allard and Siegmund and an orderly, Roland Brissette, arrived at Soltys' room at about the time he was put on the stretcher. Allard had with her a disposable yellow gown on which she had lettered the words "Yellow Bird Express." This was put on Soltys by either Allard or Brissette. Someone then handed Brissette a brown plastic bag which he placed over Soltys' feet. Siegmund then said that a surgical mask was needed, and one was placed over the patient's face. It was then suggested that a hat was needed and a plastic shower cap was put on Soltys' head. All of this was accompanied by considerable laughing and talking on the part of the nurses. The nurses testified that Soltys joined in the laughing and chatter and made no objection to what was being done. This testimony was contradicted by Nurse Haagsma who said that Soltys was quiet and withdrawn because of the sedatives given him. The administrative law judge credited Haagsma's testimony. None of the nurses or any of the other personnel wore any protective gowns or masks.

When preparations were completed, Siegmund told Allard to call Mrs. Soltys and tell her that they were taking her husband to surgery in case she wanted to see him. Allard had Mrs. Soltys paged and, when she responded, gave her the message. The entire group then started to wheel Soltys' stretcher through the hall to the surgical suite. At about the time the stretcher was leaving Unit D, Brissette left to return to his regular station. Mrs. Soltys met the stretcher as it left Unit D, and Mrs. Fleming, Director of Nursing, was in the hall a short distance away. According to Mrs. Soltys, there was a lot of laughing and joking going on, but her husband was drowsy and did not join in. Mrs. Soltys wished her husband good luck, said she would see him after the operation and left. The stretcher, accompanied by the four nurses, then proceeded past Mrs. Fleming, who made no comment. When they arrived at the surgical suite, the nurses turned the stretcher over to the Operating Room Supervisor Russell. In response to a direct look from Russell, Siegmund said, "What's the matter can't you take a joke so early in the morning?" Russell replied, "Not this."

At about 9:30, Mrs. Soltys asked Fleming of news of the operation, and told her that she was very upset about the manner in which her husband was taken to the operating room. She asked Fleming not to say or do anything about it at that time because she was concerned about her husband's condition and did not want to appear to be an interfering wife.

Mrs. Soltys met Siegmund at the cafeteria during lunch. They talked about her husband's condition, but the "Yellow Bird Express" was not mentioned. At about 2:45 that afternoon, Mrs. Soltys, while giving a patient report to Associate Director of Nursing Diane Canty, told her about her husband's trip to the operating room. She asked Canty to tell the nurses on Canty's shift to be sure that her husband never learned how he was dressed.

When Mrs. Soltys came to visit her husband that evening, she met Richard Garber, an administrative resident, in the lobby. He asked her if what he had heard about her husband was true; she confirmed that it was and told him she was very upset about it. Garber then called the hospital administrator, Bernard Gagnon, partially described what happened, and said that this had upset Mrs. Soltys. This was the first time that Gagnon learned of the incident, and he said he would look into it.

Mrs. Soltys also discussed the affair with the Supervisor of the Intensive Care Unit, Richard Guibault, who told Nurse Marsha Dean that Mrs. Soltys had been crying and was upset about the "Yellow Bird Express"

lettering on the gown and the fact that she had been called to come see her husband under such conditions.

Gagnon immediately started an investigation and on Monday, April 12, at about 3:00 P.M. called Siegmund, Allard, and Plaza to his office. He told them that their actions had humiliated their patient and had upset Mrs. Soltys, who was worried about her husband's having cancer. Gagnon went on to tell the nurses that they had acted unprofessionally and that, since he was emotionally upset by what happened, he did not want to take any action at the present time. He suspended all three pending further investigation and adverted to the possibility of termination. He did not ask the three nurses for their version of what had happened, why they had done it, or if anyone else was involved.

On the next day, April 13, a number of nurses gathered outside Gagnon's office, asked that the three nurses be reinstated, and presented him with a petition signed by a number of employees stating their belief that the suspensions were caused by the nurses' union activities. The administrative law judge found, and the record bears him out, that the hospital was well aware of the union activities of all four nurses. They all wore union buttons, and notations to that effect had been placed in their personnel files. Allard had testified at CNA's certification hearing. Siegmund's record showed that Soltys had noted, during the union campaign, in an otherwise favorable evaluation, "[E]motionally she had not been up to her normal self, and the personnel in her unit have also been feeling the uprising tensions."

There is no evidence that there was any overt animosity or hostility between the four nurses and Mrs. Soltys prior to the incident.

An article appeared in a local newspaper on April 13 which reviewed the efforts of the nurses to organize over the past year, reported the suspensions, and stated that those suspended had or would fight the trumped-up charges which were aimed at weeding out unionism in the hospital. The article further stated that the hospital had not released any of the news to the press.

During the same day, April 13, Gagnon reprimanded Director of Nursing Fleming for not taking immediate disciplinary action when she saw the stretcher in the hallway.

On Wednesday, April 14, Fjellman was identified as the fourth nurse involved in the incident. Gagnon also questioned Brissette, who denied that he was involved at all.

Gagnon discharged all four nurses on Wednesday, April 14. In identical letters, he stated that he had completed his investigation, had spoken with everyone involved, and offered anyone who wished to provide him with information an opportunity to do so. The letter concluded: "I have received no explanation or reasons to conclude that the conduct in question was anything but totally unprofessional and unjustifiable. Accordingly I am informing you that your services at this hospital are terminated effective this date."

The nurses attempted to utilize the hospital's established grievance procedure and wrote a letter to the President of the Board of Directors stating that they believed their discharges were a direct result of the union campaign at the hospital. The President replied by stating that, since the nurses had filed charges with the N.L.R.B., they should be resolved there.

In his "Concluding Findings," the administrative law judge set forth the test which he applied in determining whether the facts supported findings of illegal discharges:

> While the burden of proof in this case is on the General Counsel to establish that the discharge and refusal to reinstate the four nurses was caused by their union activities, it is not necessary for the General Counsel to establish that the union activities were the sole cause of the action against them. Rather, it is sufficient for the General Counsel to establish that the action taken against the nurses was at least partially caused by their union activities.

After analysis of the facts, he concluded:

> In the light of all the above, I conclude that the preponderance of the evidence

supports the inference that the union activities of the four dischargees and of the hospital employees generally played a substantial role in Gagnon's decision to discharge and not to reinstate Nurses Allard, Fjellman, Plaza, and Siegmund and that by discharging and refusing to reinstate them, Respondent violated Section 8(a)(3) and (1) of the Act.

The Board affirmed the rulings, findings and conclusions of the administrative law judge, modified his remedy[4] and adopted his recommended order. In a footnote, the Board stated:

> We agree with the Administrative Law Judge's conclusion that the discharges of Geraldine Siegmund, Sharon Allard, Susan Fjellman, and Marlene Plaza were discriminatory. Although other factors may have played a role, we conclude that *but for* their union activities none of the four would have been fired. (emphasis added).

This, of course, was not what the administrative law judge had found.

■ The test in this circuit for determining whether there has been an 8(a)(3) discharge violation has been set forth repeatedly and at length. In *N. L. R. B. v. Billen Shoe Co.,* 397 F.2d 801, 803 (1st Cir. 1968), we held:

> If we were to draw a further lesson from this case, and too many others like it that we have had, it is that it is all too easy to say that adequate cause for discipline was seized upon as pretextual in the case of union representatives. The fact is that adequate cause for discharge is of peculiarly legitimate concern in such instances; management cannot run its plant if union organizers can ride roughshod on the basis of their position. When good cause for criticism or discharge appears, the burden which is on the Board is not simply to discover some evidence of improper motive, but to find an affirmative and persuasive reason why the employer rejected the good cause and

chose a bad one. The mere existence of anti-union animus is not enough. The fact that the employer may be pleased to effectuate the discharge does not mean that this was his primary motive. *See NLRB v. Lowell Sun Publishing Co.,* 1 Cir., 1963, 320 F.2d 835, 842.

We have adhered to that test consistently. *N. L. R. B. v. Rich's of Plymouth,* No. 77-1497 (1st Cir. June 6, 1978), 578 F.2d 880; *N. L. R. B. v. South Shore Hospital,* 571 F.2d 677 (1st Cir. 1978); *Coletti's Furniture, Inc. v. N. L. R. B.,* 550 F.2d 1292 (1st Cir. 1977); *Stone and Webster Engineering Corp. v. N. L. R. B.,* 536 F.2d 461, 464 (1st Cir. 1976); *N. L. R. B. v. Fibers International Corp.,* 439 F.2d 1311, 1312 (1st Cir. 1971); *N. L. R. B. v. Gotham Industries, Inc.,* 406 F.2d 1306, 1310 (1st Cir. 1969). We caution the Board that *Colletti's Furniture* in which we used the words "but for" is not to be read as a dilution of the standards set forth in *Billen Shoe,* but is a reemphasis in different words of the rule we have adhered to for more than a decade. The Board must find that anti-union animus was the dominant motive for the discharge and that it would not have taken place "but for" such animus. As we most recently pointed out in *Rich's of Plymouth, supra,* the test requires more than lip service; analysis of the facts is necessary.

Even if we assume that the Board's footnote was based on an independent analysis of the evidence rather than a *post hoc* attempt to bring the administrative law judge's finding within the scope of the rule of this circuit as repeated in *Coletti's Furniture,* the facts do not support a finding that the nurses "would not have been fired but for . . . [their] union activities." *Id.* at 1293. Unlike *Coletti's Furniture,* this was not a close case, and the decision of the administrative law judge as a whole makes it clear that he not only applied the wrong test, but that the most he could have found on these facts was what he specifically stated, "that the action taken against the nurs-

---

4. The administrative law judge ordered that interest at the rate of 6% per annum be added to the loss of earnings payments for the dis-

charged nurses. The Board, upped this to 7%, based on the adjusted "prime interest rate" as used by the Internal Revenue Service.

es was at least partially caused by their union activities."

The facts here are such that there would have been no discharges "but for" the macabre incident involving Mr. Soltys. The administrative law judge specifically found:

Turning to the incident which led to the suspensions and discharges, I find that the evidence does support Respondent's contention that the nurses' conduct was unprofessional and inconsistent with the needs of the patient.

.     .     .     .     .

Thus, I conclude that the incident cannot be explained as a mere exercise of discretion, perhaps misguided, taken in the interest of calming an overly apprehensive patient, and that Gagnon on the basis of the evidence before him had cause to reject the explanation given by the nurses and to conclude that what they had done was unprofessional.

The hospital administrator started an investigation as soon as he learned what happened. There is no evidence to suggest and no findings made that the investigation was conducted unfairly. Nor can this incident be characterized as a slight aberration from normal conduct that the employer seized upon to use as cover for anti-union motivated discharges.

■ It is difficult to see how the hospital administrator had any other choice but to discharge these nurses. Leaving aside entirely the effect on Mrs. Soltys, the "Yellow Bird Express" was bound to raise serious doubts with patients and other hospital personnel as to the quality of nursing care at the hospital. Since the evidence falls far short of proving that anti-union animus was the primary motive for the discharge and that there would have been no discharges "but for" the protected activities, we must reverse. To do otherwise in these circumstances would amount to a holding that union membership is a complete barrier to a discharge during an organizational campaign.

## THE 8(a)(1) VIOLATIONS

The next issue is whether the various, allegedly coercive comments were sufficient to support the Board's finding of a violation of section 8(a)(1). The administrative law judge found, and there is little dispute, that the following statements and comments were made.

On or about April 28 when some nurses were engaged in picketing and handing out leaflets outside the hospital for the first time, the Associate Director of Nurses, Mary Ann Bell, told Nurse Patricia DeFillippo that she hoped that none of the girls on her shift would be out there picketing and that it would not go well for them.

During the time that the handbilling went on, Bell joined a group at a coffee break, which included Nurse Theresa Ann O'Donoghue, who had participated in the handbilling and several others. Bell stated that she hoped that they were not jeopardizing their jobs by handbilling and hoped that what they were doing was not illegal. She also stated that she would not advise any of her nurses to be out there participating. On other occasions, Bell stated to nurses who were participating in the union activities that she hoped they were not doing anything illegal and that she would not want the nurses to put their jobs in jeopardy because of their organizational efforts.

In early May, Bell asked Nurse O'Donoghue if she had changed her mind yet on how she was going to vote. O'Donoghue replied that she had not, and Bell then said that she was not telling her which way to vote.

During the spring union activity, another Associate Director of Nurses, Diane Canty, called Nurse DeFillippo aside on a number of occasions to talk to her about the Union, sometimes in the presence of other nurses. On most of these occasions, Canty stated that she thought the Union was violent and usually showed the nurses a booklet of newspaper clippings critical of the Union. Canty told the nurses that they did not need a union, that the hospital Board members realized they had made mistakes, that they were willing to correct them, that the

nurses should give them another chance, and that they would probably do well for them.

On another occasion, Canty gave examples to Nurse Pamela Moylan and two others of what would be different in the hospital if the Union were recognized. Canty said that she would have to be a better supervisor because stewards would be watching her and would probably report her if she did not carry out her responsibilities. Canty went on to say that she would have to be stricter in enforcing rules, that the nurses would have to wear their caps until 11:00 P.M., that there would be no smoking in the back room, and similar regulations would be enforced. She also told the nurses that if they did anything wrong, they would receive a verbal warning, a written warning, and then discharge. She stated that if management violated the contract in any way, the Union would be quick to file a grievance. Canty further told Moylan that it was important to vote in the election, that she would not tell Moylan how to vote, but that it would be Moylan's decision to make.

The administrative law judge found that Bell's statements to DeFillippo, O'Donoghue, and others were implied threats of reprisal for picketing and promises of benefits and violated section 8(a)(1) of the Act. It was found that Bell's questioning of O'Donoghue relative to changing her mind was insufficient to support a finding of coercive interrogation. The administrative law judge found that Canty's statements to DeFillippo and others about the hospital Board conveyed a promise of benefits. He further found that Canty's statements to Moylan and two others did convey a threat of reprisal if the nurses voted for the Union. The administrative law judge also found that Canty's statements about union violence and the showing of the booklet of clippings were a valid exercise of free speech and did not constitute an unfair labor practice.

Section 8(c) of the Act allows the employer a certain amount of latitude in expressing its opinions during the Union organizing period.

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c).

We have already addressed the "free speech" provision of the Act in two cases, *N. L. R. B. v. Arrow Elastic Corporation,* 573 F.2d 702 (1st Cir. 1978), and *N. L. R. B. v. South Shore Hospital supra,* 571 F.2d 677, neither of which offer much comfort to the hospital here. In *South Shore Hospital,* we found that an honest answer by a hospital executive during an employee meeting was not an unfair labor practice. In *Arrow,* we found substantial evidence to uphold the finding of the Board that a speech by the employer promising that a fixed pension plan would be added to the existing profit sharing program was a promise of benefits resulting in an unfair labor practice.

The respondent urges the proposition that front line supervisors do not have the authority to announce company policy and that statements made by them cannot be attributed to management. It cites in support thereof *Utrad Corporation v. N. L. R. B.,* 454 F.2d 520, 524 525 (7th Cir. 1971). We note that, here, the statements were made by supervisors who were associate directors of nurses. They were directly in charge of the nurses. A nonprofit hospital is not run like a manufacturing company, and what an associate director of nurses has to say would carry a great deal more weight than the words of the "low level supervisor" in *Utrad.* The hospital also cites to our decision in *N. L. R. B. v. Garland Corporation,* 396 F.2d 707 (1st Cir. 1968), as the basis for a finding that these comments did not constitute an 8(a)(1) violation. *Garland* involved "only three relatively minor incidents by junior company officials that fly in the face of the instructions of a plant manager whose sincerity

has been in no way impugned." *Id.* at 709–710. We found in *Garland* that "the employer exhibited broad and sustained efforts to inform the employees of its determinedly neutral position." *Id.* at 710. There were no such efforts here.

██ While this is a close case, the number and the tone of the comments and statements are substantial evidence for the Board's finding of 8(a)(1) violations.

The order of the Board relative to the discharges is set aside.

The Board's notice shall be further modified by striking paragraphs three and four of the prescribed notice. The remainder of the Board's order shall be enforced.