NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ST. ANNE'S HOSPITAL, Respondent.

No. 80–1614.

United States Court of Appeals,
First Circuit.

Argued March 3, 1981.

Decided May 5, 1981.

Victoria A. Higman, Washington, D. C., with whom William A. Lubbers, General Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy

\* Of the District of Massachusetts, sitting by designation.

Associate Gen. Counsel, Washington, D. C., were on brief, for petitioner.

John F. Flynn, Providence, R. I., with whom Regan, Carberry, Flynn & Gelineau, Providence, R. I., was on brief, for respondent.

Before BOWNES and BREYER, Circuit Judges, and WYZANSKI,\* Senior District Judge.

BOWNES, Circuit Judge.

This case is before us by application of the National Labor Relations Board pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), for enforcement of its order issued against St. Anne's Hospital (the hospital) on September 28, 1979, and reported at 224 N.L.R.B. 130. The issue is whether there is substantial evidence to support the Board's finding that the hospital violated § 8(a)(1) of the Act by interfering with the rights of employees to engage in protected, concerted activity and by retaliating against three employees by discharging two of them and disciplining and changing the job assignment of the third.

*The Facts*

The record shows that most of the testimony adduced during the four-day hearing was uncontradicted. The case concerns the operating room staff at the hospital which, at the pertinent times, consisted of approximately seventeen full-time and part-time employees, including registered nurses, licensed practical nurses and operating room technicians. An outline of how the staff functioned is necessary to understand the issues. There are two types of nurses in the operating room during a surgical procedure: scrub nurses and circulating nurses. Scrub nurses are either registered nurses or operating room technicians. Circulating nurses are mostly registered nurses. Scrub nurses are part of the operating team; they pass instruments and other needed material to the surgeon and may directly assist him by holding clamps and sponging the patient

if this is not done by another doctor. The number of scrubs assigned to a given operation depends on its complexity and length. Scrubs must, of course, be completely sterile. Scrubbing is a highly technical and skilled job that requires an intimate knowledge of the instruments and supplies that will be used in a particular operation. For this reason, scrubs, regardless of whether they are registered nurses, receive specialized training.

Circulating nurses, on the other hand, do not participate directly in the operation. They prepare patients for surgery, make sure that all laboratory reports are on hand, assist the anesthesiologist, and take the patient to the recovery room after the operation is over. Circulating nurses also are on hand during the operation to see to it that the scrubs are performing properly. Unlike the scrubs, however, they are not sterile and function outside the sterile field of the operation.

Until the differences between the operating room staff and the hospital surfaced, it had not been the practice to use circulating nurses as scrubs and several of the circulating nurses had not assisted in major surgery as scrubs for a number of years.

The regular work week for the operating room staff was forty hours with time and one-half for overtime. The staff personnel are regularly scheduled for on-call duty which required that they be within telephone reach of the hospital. Until March of 1978, circulating nurses were on call one night a week and scrubs were on call two to three nights a week. In January of 1978, the operating room staff received $1.00 per hour for on-call duty.

The disagreement leading to this case started on January 25, 1978, when some of the operating room staff heard that the delivery room nurses were receiving $3.00 per hour for on-call duty. This was confirmed the next day by the operating room supervisor, Hilda Paruch. A series of meetings then ensued during which a group representing most of the operating room personnel was formed. A number of letters were sent to the hospital administration,

one of which threatened a strike if the short-term goals of the group were not met. There was no strike, but the group and hospital administration, despite a number of joint meetings, could not agree on an overall on-call policy, although agreement was reached on compensation. The group retained private counsel.

On February 23 the group elected Madeline Souza as spokesperson and Joy Cawley as secretary-treasurer; both were registered nurses and worked as circulating nurses. Other members of the group included registered nurses Helen Loos, Rose Mary Almeida, and Leslie Rocha, all of whom worked as circulating nurses, and operating room technician, Patricia Danis. The group discussed a rumor that the hospital was planning to resolve the on-call policy dispute by no longer distinguishing between scrub and circulating nurses. Several nurses expressed the feeling that they were not qualified to scrub for major surgery without additional training.

On the same day, the first of the alleged unfair labor practices occurred. According to the testimony of Cawley, the operating room supervisor Paruch went into a supply room where Cawley and Loos were talking during their afternoon break and told them they were not to have any more meetings of that sort on hospital time. Paruch denied this; the administrative law judge (A.L.J.) specifically credited Cawley's testimony.

Souza told Paruch on February 24 that the group had retained counsel. Paruch responded by saying that such action was almost like a threat. A few days later she assembled the operating room personnel, and told them that, although she had been sympathetic to them at first, she was now on the side of the administration because they had hired a lawyer. At about the same time, Paruch told her niece, Leslie Rocha, not to be seen coming to work with Souza as she had been doing.

On February 27 the group met with the director of hospital personnel, Robert Seeley, and the assistant director of nursing services, Theresa Nientimp. They were

told that the on-call policy from then on would be to schedule circulating nurses, as well as scrubs, for call duty as scrub nurses. Almeida, Rocha, and Cawley stated that they were not qualified to work as scrubs without further training. Nientimp told them that if they did not feel qualified to assist at an operation, they should not do it.

The group was upset by the new on-call policy. They met on February 28 and a letter was drafted and delivered to the hospital administrator telling him the on-call policy was unacceptable and asking for a meeting with their spokesperson within a week. Another letter was sent on March 1 stating that members of the operating room staff "have expressed a grave concern for the welfare of the patients regarding that aspects of the Call Policy which would require Nurses inexperienced in the art of Scrubbing to assume the responsibilities of Scrub Personnel." The letter requested a delay in instituting the new policy until a reasonable training period be given those inexperienced in scrubbing; a four-month period was recommended.

The operating room staff was assembled by the Director of Nursing Services, Margaret Goslin, and her assistant, Nientimp, on March 3. The new on-call operating room policy was read; Goslin said she would speak to the nurses on an individual basis, but would not meet with them as a group. The new policy of assigning circulating nurses to scrub was discussed with Goslin and Nientimp a few days later. Goslin said that if a nurse did not feel qualified to accept a scrub assignment, she should inform her supervisor and other arrangements would be made.

Souza testified that early in March, Paruch told Souza and Loos, when they were eating lunch in a hospital kitchen, that they were not to have any meetings on hospital property. When Souza protested that it was their lunch time, Paruch said it made no difference. Paruch denied ever telling any of the nurses that they couldn't talk on hospital property. The A.L.J. specifically credited the testimony of Souza.

The last meeting between the operating room group and the hospital administration took place on March 15. Personnel Director Seeley read the hospital's grievance policy and a statement relative to employee conduct. Seeley then stated that some of them had poor attitudes, that he had received complaints about this, and that he wanted them to know that the hospital could suspend or fire employees who were uncooperative.

For a number of years prior to 1978, Souza or Almeida had taken over as operating room supervisor for Paruch when she was not there. For handling this additional responsibility, which entailed assigning nurses to operations, rescheduling of operations and calling in additional staff, they received additional pay of twenty-five cents per hour. In late February of 1978, Paruch arranged for a leave of absence in March because her mother was terminally ill. Almeida agreed to act as supervisor during the time Paruch would be away. Paruch subsequently informed Almeida, after attending a meeting with members of the administration, that "they" did not want her to take charge because of her "involvement." Paruch was away from March 11 to March 18; neither Almeida nor Souza were made acting supervisor of the operating room, nor were they ever again given this responsibility.

On March 17 Rocha was given a warning by Nientimp for behaving in an "unprofessional and unacceptable manner relative to the needs of the Operating Room." The facts culminating in this warning were as follows. Rocha was sitting in the operating room lounge at about 7:30 A.M. with other nurses when Dr. Shulman was informed by telephone that Dr. Shea's case was at the operating room door. Dr. Shulman told the nurses in the lounge that the patient was waiting. Rocha, who had not been assigned to the case, called Nientimp and told her that the operating room was not fully staffed, that there was no one in charge and some nurses had not yet reported for duty. Rocha then went to the operating room to receive the patient. Dr. Shea asked who was going to circulate and said,

seemingly in jest, that he would circulate himself. This upset Dr. Shulman, who said that he would circulate while giving anesthesia. Rocha then said she would be the circulating nurse and remarked, "I am doing this out of a sense of duty." After the operation, which was completely routinely, Dr. Shea said to Dr. Shulman, "Thanks a lot." Dr. Shulman took this as sarcasm. He then saw Nientimp and told her that "things aren't going too well in the OR," and gave his version of what happened. Dr. Shulman did not request or suggest that Rocha be disciplined. Nientimp did not inquire of Dr. Shea or Rocha as to what had happened before issuing the warning. This was the only warning Rocha had received in her ten years of service at the hospital.

On the same day, March 17, Almeida received a suspension. She was scheduled to work from 8:00 A.M. to 4:30 P.M. and to be on call the rest of the day. There was a bad snow storm early that day and Almeida called to say that she could not get in because of road conditions. Under hospital policy, she was, therefore, excused both from working her scheduled shift and from call duty that night. Nientimp called Almeida about 11:00 A.M., explained that she was short of call nurses and asked whether she would take call duty for the evening. Almeida asked if she would be paid time and a half if she were called to work; Nientimp said no, and Almeida then said no. After discussing the situation with her husband, Almeida called Nientimp back and suggested that she would report to work between 12:00 and 1:00 P.M. if Nientimp would sign her in for a full day, thus qualifying her for time and one-half if called to work while on call. Nientimp said she could not approve such an arrangement. Within a short time, Nientimp called Almeida again and told her that she was suspended and, if she had any questions, to see Seeley, the personnel director. Almeida met with Seeley that afternoon who told her the reasons for her suspension were extortion, bribery, bad attitude, and lack of cooperation with the hospital. The suspension was for ten days, March 17 to March 27.

Madeline Souza, the spokesperson for the operating staff group, was discharged on March 27. The reason given in her termination letter was:

On Friday, March 24, 1978, while acting as a scrub nurse on an emergency assignment and in the presence of a patient, you walked out of the operating room refusing to follow through with your assignment.

The letter also described her attitude as "[u]sually cooperative, bitter and agitative for past 2 months." Souza had worked at the hospital for sixteen years. Her latest job evaluation, made on September 3, 1977, gave her the highest rating for job knowledge, job responsibility, quality and quantity of work performance, initiative and interest, and rate of progress versus education and training. Her supervisors stated that she was very reliable and competent.

As the facts show, this was not a simple case of refusing to carry out an assignment. Souza was told on March 24, while working her regular 7:30 A.M. to 3:00 P.M. shift, that she would be needed to circulate at operations which were scheduled for 3:00 to 4:00 P.M. The operation scheduled for 3:00 o'clock was an exploratory laparotomy, a major surgical procedure. The start of the operation was delayed; at 3:20 P.M. Paruch told Souza that Souza and Jeanniene Labreche would be the scrub nurses and that she, herself, would be the circulating nurse. Labreche was an operating room technician, not a registered nurse, and always worked as a scrub. Souza had not acted as a scrub for two years and had never done so for major surgery. Over 90% of Souza's working time was spent in the recovery room. The sudden change of assignment upset Souza, especially because she knew that the patient had been through two other recent operations and was not in good physical condition. Because no other doctor was listed for the operation, Souza assumed that Labreche would assist the surgeon and she would be first scrub. Despite her misgivings about her ability to perform properly, Souza prepared to go ahead. She asked

Labreche to go over the special instruments with her; this was done while they waited for the patient to be brought to the operating room. At about 3:45 P.M. Paruch returned to the operating room and Souza said, "I am sorry Hilda, I can't do it." Paruch told her to circulate instead of scrubbing. Souza, overcome by stress and upset at having to refuse an assignment, began to cry. She left the operating room to get control of herself, which took about ten minutes. The operation had not begun when she returned, and she acted as circulating nurse throughout the operation, which was completed without incident. On the following Monday, March 27, Souza was discharged.

On March 25 Rocha learned on her arrival at the hospital that she had been assigned to scrub for an aortic aneurysm operation. The only others listed on the schedule were the surgeon and an operating room technician. Rocha immediately went to the charge nurse and told her that she did not feel qualified to assist or be first scrub at this type of operation. She was told to take it up with Paruch, who had not yet arrived. When Paruch got there, Rocha repeated what she had told the charge nurse. Paruch told her to return to the operating room and scrub. After Rocha reiterated that she did not feel qualified, Paruch said, "If I tell you to assist, you will assist and if I' tell you to first scrub, you will first scrub." Rocha replied, "I am not refusing to scrub but I just do not feel qualified to assist or to first scrub." Paruch then ordered Rocha to follow her into the nurse's locker room where she said, "[Y]ou get into that room and scrub." Rocha left the locker room and sat down in the corridor to calm herself. Paruch then ordered her to go to the nursing service office. At the office Rocha told Nientimp about her inability to assist or act as first scrub at the operation. Nientimp responded by saying that Rocha was only assuming that she would be first scrub or assisting. Rocha then said that she would act as second scrub or "back table" for the operation. Nientimp replied to this by telling Rocha that, because she already had a warning, this was

serious and would result in at least a suspension. She also said that she was going to discuss it with Paruch. Rocha was instructed to go to the personnel office. Nientimp and Paruch then discussed the matter with Seeley. After a two-hour wait in Seeley's office, Rocha was handed a termination notice which contained the following:

On Tuesday, March 28, 1978, when assigned as a scrub nurse on an assignment in the Operating Room, and in the presence of your supervisor and other nurses, you refused to follow through with your assignment.

The termination notice had essentially the same description of attitude as did Souza's, "[u]sually cooperative, most recently bitter and agitative." Rocha's latest job evaluation report, made on September 1, 1977, on a scale of 1 to 5 (5 being the highest), rated her 4 for job knowledge, job responsibility, quality and quantity of work performance, initiative and interest, cooperation with others, attitude towards hospital and department, and rate of progress versus education and training. Her supervisor's comment was, "Will do whatever she can to meet the needs of the OR schedule." Rocha had worked at the hospital for more than ten years.

Patricia Danis went back to work at the hospital as an operating room technician in January of 1978 after an absence of almost four years. She joined the operating room group and attended meetings with hospital officials. Paruch warned Danis at the end of January that, as a new employee, she ought to be "low-key" at the meetings. On April 3 Paruch called her to her desk and showed her an evaluation form that had the word probation at the top. Danis asked Paruch the significance of this and was told that every new employee at the hospital was on probation for three months. Paruch then went on to say that at the end of the three months she could end the probation, extend it, or recommend dismissal. Paruch then pointed to the attitude section of the evaluation form, said she had spoken to Danis about this before and that those in

the operating room were a team and could not stick to groups.

In March Almeida told Paruch that she wanted to work through her eighth month of pregnancy, but did not want to be on call during that month. This was in accord with past hospital practice. Paruch said she would check on it; she later informed Almeida that, despite the past practice, she would have to remain on the call roster if she wanted to work the eighth month. Almeida appealed to Nientimp who said, "with the new women's lib and equal rights," if she wanted to work, she would have to be on call. Almeida felt that on-call duty during her eighth month would be too tiring, so she took maternity leave one month earlier than planned.

When Almeida returned from maternity leave in September, she requested assignment to the operating room where she had worked for ten years and had been charge nurse for five. This request was denied by Nientimp who said that the operating room hours were filled. Almeida was assigned duties as a staff nurse. There was uncontradicted testimony that during the preceding six years every full-time operating room nurse had been allowed to return to the operating room after maternity leave.

*The Board's Decision and Order*

Except in one respect,[1] the Board affirmed the rulings, findings and conclusions of the A.L.J. It found that the hospital had violated § 8(a)(1) of the Act in the following particulars: by discharging Madeline Souza and Leslie Rocha; by issuing a warning to Rocha; by threatening Patricia Danis with extension of her probationary period or dismissal if she continued her association with the operating staff group; by suspending Rose Mary Almeida; by refusing to allow Almeida to work her eighth month of pregnancy without also being on call; by not assigning Almeida to the operating room

when she returned from maternity leave; by warning Rocha not to be seen coming to work with Souza; and by prohibiting Souza, Loos and Cawley from talking together on the hospital premises during nonworking hours.

The Board agreed with the A.L.J. that the hospital took these actions because the nurses involved had engaged in protected, concerted activity.

Our review of the record convinces us that the evidence of the § 8(a)(1) violations was not only substantial; in most respects, it was overwhelming. The two nurses who were discharged were very active in the group protesting the hospital's call policy. Their records at the hospital over a period of sixteen years (Souza) and ten years (Rocha) were exemplary. The hospital stresses the seriousness of a nurse walking out of an operation, but ignores the fact that in both instances, the nurses acted out of concern for the patients. This is in contrast to *Hubbard Regional Hospital v. NLRB*, 579 F.2d 1251, 1253 (1st Cir. 1978), relied on by the hospital; the nurses in *Hubbard* made sport of the patient as they took him to the operating room. Moreover, the operating room group had been told explicitly by Nientimp and Goslin that if a circulating nurse did not feel competent to scrub, she did not have to and other arrangements would be made.

The treatment of Almeida was also clearly retaliatory. Although she may have been trying to take advantage of the snowstorm to get time and one-half if she was called to work, she was not asking to get paid for hours that she did not work. She made a straightforward request, which was denied. The ridiculous accusation of bribery and extortion by the hospital personnel director was a reflection of his hostility against any member of the group. The refusal of the hospital, contrary to its past policy, to allow Almeida to return to work

1. The A.L.J. found as a fact that the hospital had refused to assign Souza or Almeida to act as charge nurse of the operating room in Paruch's absence because they participated in protected, concerted activities. He ruled, however, as a matter of law that the appointment of temporary supervisors is outside the protection of the Act and, therefore, there was no violation. The Board reversed and found an 8(a)(1) violation.

The hospital has not raised this issue on appeal and we, therefore, do not reach it.

in the operating room after her maternity leave can only be interpreted as retaliatory. Again, we have a nurse with a spotless ten-year record whose only fault was that she was an active member of the operating room group.

The facts as to prohibiting talking at work and the veiled threats to the probationary operating room technician are not as stark, but easily meet the substantial evidence requirements.

We find no merit in the hospital's contention that the Board did not meet the test set forth in *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666 (1st Cir. 1979). The only serious question here is not whether the hospital had "good" reasons for the discharges, but whether the hospital deliberately put Souza and Rocha in a position where their lack of special training and their concern for the patient's welfare forced them to do what they did.

The order of the Board shall be enforced. Costs are awarded to the Board.